**UNION LEADER CORPORATION**

v.

**NEWSPAPERS OF NEW ENGLAND, INC. et al.**

Civ. A. No. 59–23.

United States District Court
D. Massachusetts. ·

Dec. 28, 1959.

As Amended Jan. 4, 1960.

Arthur Howard Bloomberg, Phister & Judge, Boston, Mass., for plaintiff.

John F. Groden, John S. McCann, Withington, Cross, Park & McCann, Boston, Mass., Davenport, Millane & Oldershaw, Holyoke, Mass., John J. Ryan, Jr., Haverhill, Mass., Joseph F. Bacigalupo, Lawrence, Mass., Frank & Robert H. Goldman, Lowell, Mass., Charles R. Crimmin Pittsfield, Mass., James R. Crowe, Springfield, Mass., Warren C. Lane, Jr., Thayer, Smith & Gaskill, Worcester, Mass., for defendant.

WYZANSKI, District Judge.

## I

### Introduction

1. This is a suit in which the complaint and the counterclaim each allege violations of §§ 1 and 2 of the Sherman Act [15 U.S.C.A. §§ 1 and 2] and the complaint also alleges violations of § 7 of the Clayton Act, as amended, [15 U.S.C.A. § 18].

2. The complainant, Union Leader Corporation, (ULC), is the owner of both The Manchester Union Leader, a daily newspaper in Manchester, New Hampshire, and The Haverhill Journal, a daily newspaper in Haverhill, Massachusetts. William Loeb is the president, majority stockholder, and dominant figure in the corporation.

3. As amended, ULC's complaint claims it has been and is being caused injury in violation of §§ 1 and 2 of the Sherman Act and § 7 of the Clayton Act, as amended, by 10 corporations and 11 individuals. During the pre-trial or trial of this case 4 corporations and 4 individuals were dismissed as defendants. There now remain the following 6 corporate and 7 individual defendants:

(a) The Haverhill Gazette Co., the owner of The Haverhill Gazette, a daily newspaper published in Haverhill, Massachusetts.

(b) Lowell Sun Publishing Co., the owner of The Lowell Sun, a daily newspaper published in Lowell, Massachusetts.

(c) John H. Costello, president of that corporation.

(d) Frank A. Lawlor, general manager of that corporation.

(e) Eagle Tribune Publishing Co., the owner of The Lawrence Eagle-Tribune, a daily newspaper published in Lawrence, Massachusetts.

(f) Irving E. Rogers, president of that corporation.

(g) William F. Lucey, business manager of that corporation.

(a) Holyoke Transcript-Telegram Pub. Co., the owner of The Holyoke Transcript-Telegram, a daily newspaper published in Holyoke, Massachusetts.

(i) William Dwight, president of that corporation.

(j) Enterprise Publishing Co., the owner of The Brockton Enterprise & Times.

(k) Philip S. Weld, president of Essex County Newspapers Inc., which owns The Newburyport News and The Gloucester Times.

(l) Sidney R. Cook, comptroller of Republican Publishing Company, which with the Springfield Union Publishing Company publishes The Springfield Union and The Springfield Daily News.

(m) Newspapers of New England, Inc. (NNE), a holding corporation which owns the stock of The Haverhill Gazette Co. [see paragraph (a) above]. The directors of NNE are 6 of the above-named 7 individuals, Rogers, Lucey, Costello, Lawlor, Weld, and Cook (not Dwight) together with McClure, Fuller, and Howe

who are no longer defendants herein. The said Lawlor, Lucey, and Weld are, respectively, president, treasurer, and clerk of NNE.

4. Of defendants only The Haverhill Gazette Co. has filed a counterclaim. That corporation claims it has been and is being injured, in violation of §§ 1 and 2 of the Sherman Act, by ULC.

5. Both ULC and the counterclaimant seek injunctive relief and damages. Pursuant to Rule 42(b) of the Federal Rules of Civil Procedure, this Court ordered a separate trial of all issues other than issues of damages raised by the pleadings.

## II

### Findings of Fact.

#### A. *Background of the Controversy*

6. Before a detailed statement of the facts in this case, it is appropriate broadly to sketch the background of the controversy before this Court.

7. Currently there is being waged in Haverhill, Massachusetts a life-and-death struggle between two rival daily newspapers. One is The Haverhill Gazette which, without apparent violation of law, had become in 1957, after more than a century of publication, the only daily local newspaper in Haverhill. The other is The Haverhill Journal, which entered the market in December 1957. This suit is an outgrowth of that bitter rivalry.

8. Haverhill is a city with a population of somewhat over 47,000, and its newspapers reach a surrounding area of an additional 5,000. On any one day not many more than 20,000 local daily newspapers have ever been sold in the total Haverhill area.

9. Undoubtedly it is possible to run at a profit in Haverhill two or more daily newspapers of limited news coverage and of inferior general quality. But the type of newspaper which The Haverhill Gazette has been for many years, which The Haverhill Journal has been since it began publication, and which is exemplified by other daily newspapers in Lawrence, Lowell, Holyoke, and most New England cities with a population of 20,000 to 100,000 could not succeed financially as a *wholly independent* enterprise unless either it had no rivals or had in the face of rivalry a circulation of over 15,000. This is the judgment of virtually all persons expert in the newspaper business. And this judgment is now amply supported by the last year's experience of both The Gazette and The Journal. In competition both have sustained stupendous losses. And while those losses might have been less had the rivals pursued less aggressive competitive tactics, there is every reason to believe that no matter what policies they had adopted the market could not have brought them both financial success unless one or both had reduced its quality or one or both had been operationally combined with a newspaper outside of Haverhill. In short, for what may be called the New England type of local newspaper familiar in middle-sized cities Haverhill is economically a one newspaper city. Put more technically, this means that using the joint measure of product and area we are dealing with a market so narrow that only one successful occupant is economically possible. The Haverhill market is not broad enough permanently to sustain the competition of two high grade local daily newspapers.

10. The long-time prosperity of The Haverhill Gazette was interrupted on November 20, 1957 by a strike of those of its printers who were members of Local 38 of the International Typographical Union. The Gazette managed to continue publication by employing substitutes. But, Haverhill being a community with many sympathizers with the union, the circulation promptly fell by about 50 per cent.

11. Responding either to conviction or to pressure, some merchants who had advertised in The Gazette hesitated to continue to patronize a newspaper which was having a labor dispute. They desired another medium to reach the public. And they sought out William Loeb the president and dominant figure in The

Union Leader Corporation, the company which published the prosperous Manchester Union Leader—a newspaper which enjoys in its home town a non-competitive position not shown to have been acquired by any violation of law.

12. Then followed the events which are described in the following findings. A strictly chronological order is abandoned in favor of a topical account of developments. Such topical presentation may make it easier to deal with the legal contentions of the parties. There are reviewed first, the relations between certain Haverhill merchants and the ULC; second, the relations between some union members and the ULC; third, advertising rates of the two newspapers; and fourth, the formation and functioning of Newspapers of New England, Inc.

### B. *Relations Between Certain Haverhill Merchants and ULC*

13. It has already been noted that when Local 38 of the ITU struck against The Haverhill Gazette Co. (HG Co.) certain advertisers in The Haverhill Gazette decided not to continue advertising in that paper. Some of these advertisers formed a group. Originally the group consisted of Sidney Katz and Eli Shoreman both from Elrich Shoes, Inc., Martin Bendetson, a director of Boston Furniture Company, Vincent W. Grad of Grad's Specialty Shop, Irving P. Karelis, a partner in Karelis Jewelers, and Jerome Fishbein then an employee of his father David Fishbein doing business as Hudson's Fur Shop, but since January 1, 1959 treasurer and director of Hudson's Apparel of Haverhill, Inc., the successor enterprise.

14. Katz arranged with Loeb that the group should go to Loeb's home in Beverly, Massachusetts on Saturday evening, November 30, 1957. The group asked Loeb to arrange for Union Leader Corporation to publish for Haverhill a free throwaway shopper which would carry paid advertisements of the group and others who wished to avoid patronizing The Gazette during the strike Loeb reserved his decision. The next day he decided to publish such a shopper.

15. ULC published for Haverhill a throwaway shopper on Thursday, December 5, and Thursday, December 12, 1957. Both issues received a favorable response. On that basis Loeb decided to begin the publication of a daily called The Haverhill Journal, of which the first issue appeared Monday, December 16, 1959.

16. Meanwhile on December 8, 1957 there was held at Loeb's Beverly home a second meeting of the group of merchants. Then or later the original six participants were joined by Norris Bendetson, general manager and assistant treasurer of Boston Furniture Company as well as an owner of half the stock of Brest Buick Company, and by David M. Gordon, president of Haverhill Hardware and Plumbing Supply Co. All of the eight in the group were Haverhill residents, familiar with local conditions, but inexperienced in any aspect of the newspaper business except that they were all in responsible positions in retail enterprises that advertised in the daily press of Haverhill. In 1956 and 1957, that is before the strike, the concerns with which these eight were associated had placed with The Haverhill Gazette advertising for which they paid as indicated in the following table:

|  | 1956 | 1957 |
| --- | --- | --- |
| Boston Furniture Company | $ 4,291.22 | $ 3,838.96 |
| Elrich Shoes, Inc. | 734.10 | 952.18 |
| Grad's Specialty Shop | 6,406.49 | 6,101.44 |
| Haverhill Hardware & Plumbing Supply Co. | 11,325.75 | 11,677.79 |
| Hudson's Fur Shop | 4,205.00 | 4,433.81 |
| Karelis Jewelers | 7,691.63 | 5,438.16 |

The total advertising of these six companies was at least 5% of the total local newspaper advertising of Haverhill merchants.

17. The eight individuals met with Loeb at first three times a week. After a while, the meetings were reduced to once a week. Meetings continue to this day with that frequency.

18. Loeb discussed at these meetings advertising and general newspaper policy. From the outset the eight assured Loeb that they would support The Journal with their advertising. Katz, the moving spirit, admitted, what undoubtedly must have been generally realized by all his associates, that "as a practical matter, if you gave your advertising to the Journal you would not be advertising in the Gazette". Moreover, the group, in Fishbein's words, "assured Mr. Loeb that we would aid in securing others to use the daily" Journal. Consistent with that assurance, the group did constantly solicit advertisers for The Journal. Moreover, as Martin Bendetson acknowledged, the meetings studied records of advertising in different categories—clothing, radio, automobiles—the different people that advertise with The Journal and the different ones that advertise with the Gazette."

19. When Brest Buick Co. decided to place part of its advertising in the Gazette, Norris Bendetson, who owned half of the company's stock, told the group that this was going to be done. When another member of the group, Grad, failed to inform the group in advance that his store was going to advertise in The Gazette, members of the group were surprised and criticized Grad. Indeed, Gordon testified in his deposition with respect to Grad's advertisement "We all felt he should not have put the ad in The Gazette."

20. At the group meetings there were also discussions of the desirability of The Journal having news items about labor, women, and veterans.

21. As long as the strike at the Gazette flourished, the ULC did not make any payments to the eight members of the group. But on May 22, 1958 Loeb "detected * * * slackening of enthusiasm" in the group. Thereupon he initiated a payment to each of the eight of $50 a week. These payments have continued up to the present. These payments were not publicly disclosed until depositions were taken in the case at bar. Those from whom the group solicited advertising for The Journal did not know or have reason to know that each member of the group was a paid consultant of The Journal. The payments have always been made on an individual basis—that is, even though the two Bendetson brothers are from one company and Katz and Shoreman are from the same company each receives the weekly stipend. Some but not all of the recipients keep these payments for themselves; others turn them over to their firms. Payments have no relation percentage-wise to the amounts paid for advertising by any firm. However, with the two exceptions of the one already-mentioned Grad advertisement and of $15 worth of advertising by Elrich Shoes, Inc., none of the six firms with which the eight members of the group are associated has advertised in The Gazette at any time since the Journal began publication. The Journal received in advertising during the period from December 5, 1957 to September 15, 1959 advertising in the following amounts:

| | |
|---|---|
| Boston Furniture Company | $11,907.00 |
| Elrich Shoes, Inc. | 4,673.11 |
| Grad's Specialty Shop | 14,768.71 |
| Haverhill Hardware & Plumbing Supply Co. | 38,834.11 |
| Hudson's Fur Shop | 11,159.30 |
| Karelis Jewelers | 11,022.71 |

22. It is not clear whether when Loeb began making the $50 payments he wrote a letter or memorandum with respect to these payments. At the time depositions were taken before trial the members of the group testified in considerable detail about the existence of such memoranda

and their subsequent destruction. On the first day of the trial in court Loeb testified that "I think I wrote them a rather informal letter that we would pay them $50 a week." But later in the trial Loeb and each member of the group denied that there ever was a letter or memorandum specifically referring to the $50 payments, and asserted that the destroyed documents were copies of a letter referring to other promised sums.

23. On this state of the evidence, this Court does not find that there were any documents covering the $50 payments, or that there were any *written* promises by any of the group, or that the ULC made it a *written* condition of the payments that they were in consideration of any obligation or action of any advertiser. However, the Court does find that the ULC made payment each week to each individual in consideration of his individual services in inducing the enterprise with which he was connected and such other enterprises as he could influence to advertise exclusively in The Journal and to refrain from advertising in The Gazette. In reaching this finding of fact, the Court has considered the whole tenor of the group meetings, the pledges of support the eight gave to The Journal, and the watchful attention the group gave to Gazette advertisements by their own enterprises and other enterprises. While there may not have been in a technical sense a series of unilateral oral contracts in which ULC offered to pay $50 each week to each of the eight who had in the previous week successfully induced his enterprise and other enterprises not to advertise in the Gazette, the $50 weekly payment was intended by Loeb to have, and did have, an effect indistinguishable from such a series of unilateral oral contracts.

24. In addition to providing the $50 weekly payments, Loeb on July 31, 1958 made to each of the eight merchants a written promise to give each a percentage of profits of The Journal under certain circumstances. But this agreement need not be detailed as it was superseded by the more formal agreement of December 15, 1958. Under that contract each of the eight was promised $5,000 a year for 10 years followed by $10,000 a year for the succeeding 10 years together with an overriding bonus of 3⅛% of the profits of the newspaper, the whole agreement "to be effective if and when the Haverhill Journal, under my [Loeb's] ownership or control, becomes the only newspaper published in Haverhill." In view of the effective date of these massive payments, the members of the group of eight knew it was to their "economic profit to do everything" they "could to see that Mr. Loeb did own the only paper in Haverhill." The purpose and the effect of the contract was to intensify the zeal of the eight members of the group both to support The Journal by securing advertising for it and to discourage advertising in The Gazette by their enterprises and other enterprises subject to their influence.

### C. *Relation Between Some Union Members and ULC*

25. As has already been noted Local 38 of the International Typographical Union struck HG Co. on November 20, 1957. Representatives of the International and of the Local considered the possibility of either establishing or giving support to a new newspaper to rival The Gazette. Some of the striking printers approached a ULC employee in the hope of interesting Loeb in entering the Haverhill market. But Loeb did not confer with these printers. Nor was it in response to the printers' suggestion that ULC entered Haverhill. However, having decided to enter Haverhill, ULC cooperated with the strikers in various ways, of which only two seem worth reciting.

26. One way was that ULC paid some of the strikers to distribute ULC's shopper direct to householders. At the time they rendered these services the strikers were, within the contemplation of the National Labor Relations Act, 29 U.S. C.A. § 151 et seq., employees of HG Co. And they, being printers, were not par-

ticularly qualified to act as distributors. It is fairly inferable that the purpose which ULC had in hiring these printers was to let the public know that the union was supporting ULC's new paper.

27. The other significant way that ULC sought the cooperation of the union was in the solicitation of advertising for the shoppers' edition of The Journal. Representatives of the union went with representatives of The Journal to call upon prospective advertisers. The union representatives asked merchants not to advertise in The Gazette, and simultaneously advertising solicitors of the ULC asked these merchants to advertise in The Journal.

### D. *Advertising Rates*

28. There is in the record of this case a substantial amount of information with respect to the advertising rates charged by The Gazette and The Journal. To recite all of it would serve no useful purpose now, for here we are not concerned with the assessment of damages, if any, but with questions of equitable relief. A few broad strokes will cover the ground adequately.

29. When the strike began at its, plant, The Gazette had in effect advertising rates which it had published September 1, 1957.

30. At the outset, The Journal publicly announced somewhat higher rates. For example, The Gazette had a basic local display rate of $1.40; The Journal began with a local display rate of $2.10 but in January of 1958 it retroactively changed the rate to $1.47 by application of credit to future bills.

31. Aggressively competitive, The Journal then introduced special rates for shoppers' nights, combination rates, free repeat advertising, and color advertising free of extra charge for one trial. Instead of making public announcement of the availability of these privileges, The Journal resorted to private concessions. For example, it allowed some but not all advertisers to have without extra charge a free trial of a color page. It gave to some but not to all advertisers who had paid for advertisements in the November 28, 1958 issue the privilege of having the same advertisement run free in a Christmas 1958 supplement. Most important, The Journal gave to the largest local advertiser in Haverhill, J. M. Fields, a special rate not expressly or impliedly made available to any other advertiser.

32. The Gazette likewise resorted to secret discriminatory practices. The clearest instances occurred from September through December 1958. Instead of revising rates publicly, The Gazette entered into separate agreements with local display advertisers. Exhibit C–10 shows that the rates varied without any discernible rational basis. Also in November 1958 The Gazette reduced its classified advertising rates for some but not all automobile dealers. However, these discriminations between advertisers of the same class and volume were not continued after February 1, 1959. The Gazette then put into effect publicly the rates it thereafter charged. It would serve no useful purpose to recite the new rates, or their relationship to the older rates. It will be quite sufficient to say that the evidence shows that as a whole the new rates bear a rational relation to circulation and that there is not any basis for finding that there is some improper discrimination between different types of publicly announced rates in the February 1, 1959 schedule.

### E. *The Formation and Functioning of Newspapers of New England, Inc.*

33. When the ITU threatened to strike, J. Wesley Russ, then president of The Haverhill Gazette Co., (HG Co.), sent for William B. Parry, then associate manager of The New England Daily Newspaper Association. HG Co. is one of 80 New England daily newspapers which belong to that non-discriminatory Association, and, until it resigned in 1956, ULC also was a member. The chief function of the Association is to circulate news bulletins; but on occasion

it gives advice on labor negotiations. There is no evidence that the Association has sought to establish or could establish common practices with respect to price, production, circulation, advertising, or like operational matters.

34. From the time Parry was called into the labor dispute he was in general touch with The Gazette's problems. Indeed in April 1958 Parry was asked by Russ whether money could be raised from other publishers to help The Gazette. Nothing came of this inquiry, nor of inquiries which Russ addressed to William Dwight, publisher of The Holyoke Transcript and president of The American Newspaper Publishers Association, nor of other inquiries put to various other persons in the industry. The publishers were long on advice but short on cash offers. And HG Co. had to rely on what it could borrow from local banks.

35. In the meanwhile brokers and principals inquired whether The Gazette was for sale. Among those inquiring was Manno, an agent for Loeb of the ULC, who first broached the subject in February 1958. Loeb himself, Manno, still acting for Loeb, and Cymrot, also acting for Loeb, made further approaches in the summer of 1958 by talking respectively with Russ, Ryan (HG Co.'s lawyer), and Shepherd (HG Co.'s comptroller). Finally, on October 21, 1958 Loeb made a written offer to pay $164,800 (that is, par) for HG Co.'s bonds, $308,500 (or $750 a share) for HG Co.'s 411 shares of Class A stock, and $510,000 (or $500 a share) for HG Co.'s 1020 shares of Class B stock, but payments were to be deferred in a way that made the present value of the offer nearer $500,000 than $1,000,000.

36. Not wanting to sell to Loeb, Russ promptly informed Parry and, in effect, said that the stockholders would be forced to sell to Loeb unless other financing was available. Parry explored the financial situation of HG Co. with its comptroller, Shepherd, who expressed the opinion that if the company could get $200,000 it "could perhaps succeed in getting into the black." Promptly Parry informed Lucey of The Lawrence Eagle Tribune and Lucey repeated the information to Lawlor of The Lowell Sun. As a consequence of these preliminary explorations Parry invited some New England publishers or their representatives to meet at the Lanam Club in Andover on October 31, 1958.

37. At this first meeting were Parry, Shepherd, Lucey, Lawlor, Bacigalupo, attorney for Eagle-Tribune Publishing Co., Dwight of The Holyoke Transcript-Telegram, Weld of Essex County Newspapers Inc., and Wright of Milford Daily News Co. Either in inviting persons to the meeting or at the meeting Parry told of the Loeb offer and of HG Co.'s wish to borrow money on mortgages. Parry did not say much, if anything, about the history of the rivalry between The Journal and The Gazette, as every invitee knew the story and the principal *dramatis personae*. Lawlor expressed, what was perhaps not a unique opinion in the group, the view that Loeb was "an able publisher" and a "resourceful rogue".

38. This first meeting began with Shepherd's financial analysis of HG Co. and with talk about a secured loan to HG Co. However, the discussion of a loan was abandoned after the arrival of Ryan, who, as attorney for Mrs. Muriel Russ, HG Co.'s principal stockholder, stated that she would not favor HG Co.'s borrowing further sums but that she wanted to sell her HG Co. stock. At this point Parry, Shepherd, and Ryan withdrew from the meeting. Then Bacigalupo came from the meeting with a proposal that the group would pay $50,000 at once as a down payment. Ryan promptly rejected that offer, and the meeting broke up when "everything was completely up in the air."

39. Subsequently Ryan indicated "that if the offer from the group were to match approximately the offer from plaintiff * * * it would be satisfactory." Lucey estimated that any purchasing group would have to make a down payment of $400,000 to buy all the stock of HG Co. With this figure in mind, $60,000 each was tentatively

pledged by the publishers of The Lawrence Eagle Tribune, The Lowell Sun, and The Burlington Free Press; $10,000 by the publisher of the Holyoke Transcript-Telegram, and $6,000 by Weld whose company published The Gloucester Times and The Newburyport News. Parry then prepared a list of about 50 publishers and the amounts he hoped each would subscribe to a joint venture to purchase HG Co. stock.

40. When Parry called these 50 prospects, he told them in substance, that he "was investigating the possibility of a group getting together and investing money to purchase The Haverhill Gazette; that The Gazette was for sale; * * * that The Gazette owners had an offer from Loeb, and they were not particularly interested in selling to Loeb, and it certainly would be as a last resort; * * * [he] probably discussed the possibilities * * * for experimental training, experimental purposes for training junior executives." Parry told most persons he called details of the finances of HG Co. or at least the names of other publishers who had examined HG Co.'s finances and had then decided to invest. Parry told some persons that "if Loeb succeeded in Haverhill, that then he and the union might get together and come into their territories."

41. Those who responded favorably to Parry's call assembled at a second meeting at the Lanam Club in Andover, this time probably on Monday, November 10, 1958. At the second meeting were all, except Bacigalupo, who had attended the first meeting: that is, Parry, Shepherd, Lucey, Lawlor, Dwight, Weld, Wright, and Ryan. Also present were John H. Costello, president of Lowell Sun Publishing Co., that company's attorneys Frank H. Goldman and Robert H. Goldman, Sidney R. Cook, the comptroller of the Republican Publishing Co. of Springfield, Massachusetts, James D. Ewing, publisher of The Keene (N.H.) Evening Sentinel, Charles A. Fuller, president of Enterprise Publishing Co. of Brockton, Massachusetts, Mrs. Margaret Hartford, vice president of Herald Publishing Co.

which publishes The Portsmouth (N.H.) Herald, and Walter C. Paine, publisher, of The Valley News of Lebanon (N.H.).

42. There was no chairman of this second meeting. Inasmuch as before the meeting began approximately $377,000 had been tentatively subscribed by those present it was hardly necessary to retell the entire story of the Haverhill situation. In the open meeting Shepherd did review the financial, advertising, and circulation figures; there was discussion of the Loeb offer which by then had expired; there were varying estimates as to how long it would be before The Gazette would reach a break-even point, which some thought would happen when its circulation topped 15,000; there were loose estimates as to how long The Journal would be able to survive if The Gazette held out and increased in circulation; and there was scrutiny of the general financial prospects. Unquestionably the general atmosphere reflected the participants' unanimous opinion that in the Haverhill situation only one quality newspaper could make a profit, and also reflected the participants' unanimous hope that The Gazette would be that one quality newspaper which would be profitable. Also it is clear that in asides during the course of the meeting, and probably in casual talk across the conference table, some persons expressed strong distaste for what they regarded as the predatory, unfair, and unethical competitive methods of Loeb. Reference was certainly made to Loeb's relations with unions, to the timing of ULC's entry into Haverhill, to the throwaways published by ULC, to The Journal's advertising rates, and to the possibility "that if he was successful here he could use the same tactics in other places," as Parry observed.

43. It having become apparent that so large and loosely conducted a meeting could not make a firm contract, the group delegated the making of the contract to a committee of Costello, Cook, Fuller, Weld, and Irving E. Rogers, president of the company that published The Lawrence Eagle Tribune.

44. That committee caused the organization of NNE as a Massachusetts corporation about December 10, 1958. Stock in that corporation was purchased at $25 per share by the following subscribers:

| Name of Stockholder | No. of Shares |
|---|---|
| 1. Bangor Publishing Company | 250 |
| 2. Eagle Publishing Company | 400 |
| 3. The Bristol Press Publishing Co. | 250 |
| 4. Enterprise Publishing Company | 500 |
| 5. Blair Clark | 250 |
| 6. Monitor-Patrior Company | 400 |
| 7. Danbury Publishing Company, Inc. | 140 |
| 8. Sentinel Printing Company | 250 |
| 9. William E. Foster | 800 |
| 10. News Publishing Co. of Framingham, Inc. | 200 |
| 11. Franklin County Publishing Corp. | 100 |
| 12. Holyoke Transcript-Telegram Pub. Co. Inc. | 400 |
| 13. Keene Publishing Corporation | 125 |
| 14. Walter C. Paine | 125 |
| 15. Eagle-Tribune Publishing Company | 2400 |
| 16. Malden Publications, Inc. | 80 |
| 17. Medford Publications, Inc. | 80 |
| 18. The Meriden Record Company | 100 |
| 19. The Middletown Press Publishing Co. | 120 |
| 20. Telegraph Publishing Company | 200 |
| 21. Transcript Publishing Association | 120 |
| 22. Herald Association, Inc. | 200 |
| 23. Mary E. Gallagher and Sidney R. Cook as joint tenants with rights of survivorship and not as tenants in common | 1000 |
| 24. The Torrington Printing Co. | 250 |
| 25. Ward-Griffith Company, Inc. | 400 |
| 26. Philip S. Weld | 250 |
| 27. Paul L. Haggerty and J. D. Haggerty, Jr. | 100 |
| 28. J. Warren McClure | 2400 |
| 29. H. S. Gere & Sons, Inc. | 200 |
| 30. Hastings & Sons Publishing Co. | 100 |
| 31. Lowell Sun Publishing Company | 2400 |
| 32. Claremont Publishing Company, Inc. | 100 |
| 33. Muriel Russ | 200 |

With the exception of Claremont Publishing Company, Inc. which bought its shares on December 16, 1958 and Muriel Russ who bought her shares on August 28, 1959, all of the stockholders bought their shares on December 10, 1958.

45. It will be noted that among those who became NNE shareholders were Lowell Sun Publishing Company which publishes the only daily newspaper in Lowell, Eagle-Tribune Publishing Company which publishes the only daily

newspaper in Lawrence, Enterprise Publishing Company which publishes the only daily newspaper in Brockton, Sentinel Printing Company which publishes the only daily newspaper in Fitchburg, Eagle Publishing Company which publishes the only daily newspaper in Pittsfield, Holyoke Transcript-Telegram Publishing Co. Inc. which publishes the only daily newspaper in Holyoke, and Philip S. Weld who controls Essex County Newspapers Inc. which publishes the only daily newspapers in Newburyport and Gloucester. Among the other NNE subscribers are many other publishing companies each of which publishes in its own town the only local daily newspaper published there.

46. After December 10, 1958 NNE bought all of the outstanding capital stock of HG Co. for $835,200 subject to unpaid and outstanding debentures of Haverhill Gazette Company amounting to $164,800.

47. After NNE became sole shareholder of HG Co., NNE made loans and received repayments of loans as shown in the following table:

| Name | Amount | Date |
|------|--------|------|
| Newspapers of New England, Inc. | $ 60,000.00 | 12/17/58 |
| " | 15,000.00 | 1/2/59 |
| " | 10,000.00 | 3/7/59 |
| " | 10,000.00 | 4/27/59 |
| " | 10,000.00 | 5/27/59 |
| | $105,000.00 | |
| Repaid | 85,000.00 | 3/17/59 |
| Outstanding | $ 20,000.00 | 3/17/59 |
| Newspapers of New England, Inc. | 10,000.00 | 6/4/59 |
| " | 10,000.00 | 6/26/59 |
| " | 10,000.00 | 7/7/59 |
| " | 10,000.00 | 7/27/59 |
| " | 5,000.00 | 8/5/59 |
| " | 14,000.00 | 8/27/59 |
| " | 10,000.00 | 8/28/59 |
| " | 20,000.00 | 9/29/59 |
| Total | $109,000.00 | |

48. At all relevant times in both NNE and HG Co. the president has been Lawlor, the treasurer Lucey, the clerk Weld, and the directors Lawlor, Lucey, Weld, Costello, McClure, Fuller, Rogers, Cook, and Howe. Neither the officers or directors have received compensation from either NNE or HG Co.

49. In summary of both what has been already recited and what appears in the record as a whole but has not been expressly recited, the following factual aspects of NNE's purchase of HG Co. shares deserve emphasis:

(a) ULC or Loeb was the first to make an oral proposal and the first to make a firm written offer to buy the HG Co. shares.

(b) Those who became NNE shareholders were in effect invited by HG Co. to make a bid for its stock so that shareholders of HG Co. would not be forced to make a sale they did not want to make to Loeb.

(c) Every NNE shareholder before investing either examined the financial prospects of HG Co. or relied upon the

business judgment of newspaper experts who had so examined.

(d) Every NNE shareholder believed that an investment in NNE and thus in HG Co. was a commercially justified investment.

(e) The belief of NNE shareholders that the investment was commercially justified was a reasonable belief. HG Co. had been earning upwards of $100,000 a year; if it secured new funds and new management and if it was not faced with unfair competition it was as of December 1958 reasonable to believe that within a year HG Co. would reach a break-even point and that ultimately it would regain its earlier profitability.

(f) Every NNE shareholder in purchasing acted in part because he believed that the investment was commercially justified.

(g) Many NNE shareholders in purchasing acted in part because, individually, they did not approve of Loeb's tactics in Haverhill which they regarded as predatory, unfair, or unethical. In Lawlor's words, Loeb's "comeuppance" was not an unwelcome prospect.

(h) Some NNE shareholders in purchasing acted in part because, individually, they sympathized with the owners of HG Co. and feared lest, as Weld phrased it, they "might at some time be victims of a distress similar or akin to that experienced by The Gazette." But, in acting in Haverhill, each publisher acted strictly *ad hoc*. He did not make or receive, an express or implied, a legal or a moral, commitment with respect to any newspaper situation arising in the future whether the situation was caused by labor unions, competitors, or other circumstances.

(i) No NNE shareholder either sought to accomplish, or did accomplish, any general unification of policy or operations between his business and the business of The Haverhill Gazette Co. or between his business and the business of any other NNE shareholder. Indeed the only operational connections between the business of The Haverhill Gazette and the business of any NNE shareholder are: first, that individuals may be trained at The Gazette as apprentices and thereafter may work for a shareholder in NNE; and second, that at meetings of directors or at meetings of shareholders there may be between NNE shareholders an interchange of information as to newspaper practices and policies. These types of relationship would not exist if the shareholders of NNE were all widows and orphans, or other persons who lacked an occupational connection with the newspaper industry. But while these types of relationship are related to the industry position of NNE shareholders, none of these relationships substantially enhances or affects what is technically known as "the market power" of any NNE shareholder. This may be illustrated by the example of the Lowell Sun Publishing Co. Whatever was its power to control prices and production before NNE was formed has not been appreciably augmented or affected by NNE. Before 1958 The Lowell Sun never had any market power in middle-sized cities other than Lowell such as Lawrence or Brockton or Gloucester, and it has acquired none now by investing in NNE. To be sure, it has acquired in Haverhill, and only in Haverhill, some power over prices and production which it did not have before 1958, but such power as it has over prices and production in Haverhill has not been operationally linked with its own power over prices and production in Lowell or with the power of, let us say, Weld in Gloucester. There is no linkage of subscriptions, advertisements, contracts, manufacturing processes, news gathering, or editorial policy. Nor is any such linkage contemplated.

50. Thus factually the NNE combination does not operate as a restraint of trade, or a monopolization, or an attempt to monopolize the daily local newspaper market in Haverhill, or the daily local newspaper market in a group of New England cities taken as a whole.

### III.

### Conclusions of Law and Opinion

1. The complaint charges defendants with contracts and combinations in restraint of trade (in violation of § 1 of the Sherman Act), attempts to monopolize and monopolization (in violation of § 2 of the Sherman Act), and acquisition of stock which tends substantially to lessen competition and to create a monopoly (in violation of § 7 of the Clayton Act). The counterclaim charges plaintiff with participation in contracts and combinations in restraint of trade (in violation of § 1 of the Sherman Act), and attempts to monopolize and monopolization (in violation of § 2 of the Sherman Act.)

2. It will be convenient to deal with these charges by considering chronologically developments in Haverhill and by ruling upon the lawfulness of the actions in the order in which they occurred.

3. Before December 1958 ULC published the only local daily newspaper in Manchester and HG Co. published the only local daily newspaper in Haverhill. Yet neither corporation was *then* monopolizing or attempting to monopolize in violation of § 2 of the Sherman Act. To be sure each had what a layman would call a monopoly, but neither had violated the Sherman Act for each had achieved its non-competitive position by methods "honestly industrial" or, as it is sometimes phrased, "by virtue of superior skill, foresight and industry." United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 430; United States v. United Shoe Machinery Corp., D.C.D. Mass., 110 F.Supp. 295, 297, 341. Cf. United States v. E. I. Du Pont De Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264.

4. When ULC entered the Haverhill market it went from a market in which it enjoyed a monopoly into a competitive market. And the first problem which arises is whether it was free to use in the second market the profits it had made in the monopoly market and the printing plant it had established in that market.

5. The governing principle is that one who enjoys a lawful monopoly in one market is free to enter another market but is prohibited from using in that other market what is technically called the "market power" he enjoys in the first market. "Market power" means the power to control prices or production. The principle just stated may be illustrated by two cases: an owner of the only theatre (that is, the so-called monopoly theatre) in a city is permitted to own theatres in other cities where there is competition, but he is not free to make contracts offering in combination the exhibiting facilities of the non-competitive and the competitive theatres, United States v. Griffith, 334 U.S. 100, 106, 107–108, 68 S.Ct. 941, 92 L.Ed. 1236, and an owner of a machinery patent (that is, the owner of a monopoly) is permitted to manufacture and supply both the machines covered by the patent and the materials they use, but he is not free to require licensees of his machines to use materials he supplies. International Salt Co. Inc. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20.

6. In accordance with the principle just stated, one who, like ULC, owns the only newspaper (that is, a so-called monopoly newspaper) in a city is not merely on that account prohibited from using its funds to start a newspaper in another city where there is competition. If all that is involved is the use of money, and if the money is invested with relation to a reasonable expectation of ultimate profit, or, let us say, to promote some political end, or to accomplish some other legitimate purpose and not *"primarily* for the purpose of causing loss of business to another" (Restatement, Torts § 709), the investment is not a tort and ordinarily is not a restraint of trade nor an attempt to monopolize.

7. But when more than investment is involved, and there is between the monopoly newspaper and the competitive newspaper a combination of operations or contracts a fresh problem arises. In the case of ULC there is no evidence that between its Manchester newspapers

and its Haverhill newspaper there were combination contracts covering advertising (cf. Indiana Farmer's Guide Pub. Co. v. Prairie Farmer Pub. Co., 293 U.S. 268, 273, 55 S.Ct. 182, 79 L.Ed. 356), circulation, news, or features. But it does appear that the Manchester and Haverhill newspapers were printed in the same plant. However, it does not appear that as a result of such combined operations ULC was able to procure for its Haverhill Journal newsprint, or other supplies, or printers, or other services at rates lower than HG Co. was able to procure those goods and services for its Haverhill Gazette. There is, therefore, no basis for concluding that ULC used to any substantial extent its Manchester market power in Haverhill, or that by operating in Haverhill ULC substantially increased its Manchester market power.

■ 8. Even though there was no substantial increase in ULC's market power by its mere use of its Manchester profits and its Manchester plant to publish in Haverhill the shoppers' throwaway and the daily Journal it does not follow that ULC has not in other ways attempted to monopolize in violation of § 2 of the Sherman Act. In particular, we must consider whether ULC has come within that interpretation of § 2 which prohibits a person (a) who has an intent to exclude competition (b) from using not merely technical restraints of trade, but even predatory practices, unfair methods of competition, or business patterns not honestly industrial—in short, what may loosely be called unfair means. United States v. Griffith, United States v. United Shoe Machinery Corp., both supra.

■ 9. While the phrase "intent to exclude", or its equivalent "exclusionary intent", is reiterated in anti-trust cases, it is not easy to define its precise meaning. Contrary to what a layman might suppose, a person does not necessarily have an exclusionary intent merely because he foresees that a market is only large enough to permit one successful enterprise, and intends that his enterprise shall be that one and that all other enterprises shall fail. If the evidence shows that in laying his plans and executing them he contemplates and utilizes only superior skill, foresight, and industry, he has not an intent which is contrary to law. To prove that a person has that type of exclusionary intent which is condemned in anti-trust cases there must be evidence that the person who foresees a fight to the death intends to use or actually does use unfair weapons. Putting the same idea in another way, we may say that there is no sharp distinction between (a) the existence of an intent to exclude and (b) the use of unfair means. In a situation where it is inevitable that only one competitor can survive, the evidence which shows the use, or contemplated use, of unfair means is the very same evidence which shows the existence of an exclusionary intent.

■ 10. In the case at bar there is in ULC's relations with the union some evidence of ULC's exclusionary intent and of its resort to forbidden restraints of trade. When union representatives and ULC representatives together called upon a merchant, and the union man asked the merchant to boycott The Gazette and the ULC man asked the merchant to advertise in the ULC shopper, this was in effect a joint appeal by the union and the ULC to boycott The Gazette. Such a group boycott organized by one of two competitors in a market was a *per se* violation of § 1 of the Sherman Act, was conclusive evidence of an intent to exclude competition unlawfully, and proved that ULC attempted to monopolize the market in violation of § 2 of the Sherman Act. Klor's Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S. Ct. 705, 3 L.Ed.2d 741; Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162. Nor was resort to such a group boycott excusable merely because among those participating were union representatives. Cf. Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

■ 11. More extensive evidence of ULC's exclusionary intent and its resort to forbidden restraints of trade is to be

found in ULC's relations with the eight merchants. All of these so-called consultants of ULC held responsible positions with advertisers. None of them had newspaper experience. They were in no sense a cross-section of informed Haverhill opinion. It stretches credulity to suppose that Loeb ever looked upon these eight as the best procurable advisers respecting the running of a newspaper in Haverhill. But whatever was the situation at the outset, later when, following the "slackening" of interest in the eight consultants, Loeb started to pay each of them $50 weekly, and to make the extravagant promises in the July 1958 letter and December 15, 1958 letter, Loeb was making payments and promises in consideration of each individual's services in inducing the enterprise with which he was connected and such other enterprises as he could influence to advertise exclusively in The Journal and to refrain from advertising in The Gazette.

12. This conduct of Loeb was an encouragement to a group boycott in which each one of the eight consultants acted as a watch-dog with respect to his seven fellows and other advertisers in Haverhill. As has already been noted, such a group boycott by one of two competitors in a narrow market was a restraint of trade in violation of § 1 of the Sherman Act, was conclusive evidence of ULC's exclusionary intent, and was proof of ULC's attempt to monopolize in violation of § 2 of the Sherman Act. Lorain Journal Co. v. United States, supra.

13. Moreover, another path of reasoning leads to the same conclusion. ULC's payment to the eight for their solicitation of outsiders to advertise in The Journal without disclosing to those outsiders that the eight were not disinterested fellow advertisers as they purported to be, but were paid employees of The Journal, was an unfair practice not honestly industrial. It is misleading and immoral for a producer to pay a secret commission to an allegedly disinterested person for boosting the sale of a product which that person recommends under the purported guise of a friend or skilled neutral adviser. The use of such an unfair practice by one of two competitors in a narrow market was not honestly industrial, was evidence of ULC's exclusionary intent, and was proof of ULC's attempt to monopolize in violation of § 2 of the Sherman Act.

14. Other examples of ULC's exclusionary intent and its use of unfair means are to be found in its discriminatory advertising rates. The most serious discrimination was the allowance to J. M. Fields, the largest local advertiser, of a rate 30 per cent lower than others have been offered. Less serious was the failure to inform every advertiser that it could without extra charge have one try at a color page, or that if it advertised in the November 28, 1958 issue of The Journal it could have without additional charge a reprint in a Christmas supplement in December. All these discriminatory rate practices demand condemnation. Every discrimination which is not based upon some explicable economic difference, such as economy traceable to quantity purchases, is *ex hypothesi* dictated by some ulterior motive. Where the party giving the discriminatory benefit is in a very narrow market and has in other aspects revealed a monopolistic intent it is necessary to conclude that the discrimination was given with an exclusionary intent, even though the beneficiary of the discrimination did not promise to reduce or eliminate such business as it was doing with a competitor of the donor of the discrimination. Where rate cards have been published, the very giving of a special unpublicized benefit literally means that the newspaper is not playing above board though it purports to do so. Its competitor and the public are both being told half truths. It cannot be claimed that to use against a competitor a rate which is omitted from a publicly announced rate schedule and which is not universally available to customers is to seek success solely by ability, foresight, and industry.

15. In short, where two newspapers are struggling for survival in a market where only one can succeed,

and both publicly announce the advertising rates they will follow, if either party departs from the publicly announced rate by giving secret discriminatory benefits to some advertisers, *prima facie* that party has evinced an exclusionary intent, has resorted to a practice not honestly industrial, and has attempted to monopolize in violation of § 2 of the Sherman Act. If there is anything to the contrary in United States v. Kansas City Star Co., W.D.Mo., 1954 Trade Cases 67, 683 or Scott Publishing Co. v. Columbia Basin Pub. Inc., W.D.Wash., Dec. 4, 1959, this Court respectfully declines to follow those authorities. For this Court takes the view that when an enterprise having substantial market power engages in a discrimination not justified by normal economic considerations it is *prima facie* seeking to achieve control of the market by a method at least as objectionable as those condemned in United States v. United Shoe Machinery Corp., supra.

■■■■■ 16. Another set of activities which require scrutiny are Loeb's attempts to buy all the stock of HG Co. In view of Loeb's control, through ownership or otherwise, of all the ULC stock, Loeb's offers to purchase may be attributed to ULC. Thus we have in effect a situation where one of the only two competing newspapers in a city offers to buy out the stock of the other. If this were a city in which at least two newspapers could economically survive, the offer to purchase would be an attempt to monopolize. Cf. United States v. Aluminum Corp. of America. It would not be a victory won by skill, foresight, and industry. But the situation is different where a city can accommodate only one successful newspaper, and two roughly equally able companies are competing for the single prize that is available. Skill, foresight, and industry by themselves will not give either company the victory. In addition what is required is the capacity to withstand losses. There is nothing more noble, nor more reflective of superior ability, in winning the victory by paying a large price in installments of monthly losses than by paying a large price in one lump sum payment to take over the competitor. Under the very extraordinary circumstances of this case it would have been permissible for ULC or Loeb to pay a reasonable price for the stock of HG Co. because though it would have appeared to lessen competition it would not have done so substantially; it merely would have somewhat shortened the time within which competition could continue.

17. Having discussed ULC's conduct, we now turn to defendants' conduct. The first matter to be reviewed is the activities of HG Co. during the fall of 1958 in departing from its publicly announced advertising rates by giving secret discriminatory benefits to some advertisers. Undoubtedly in giving these discriminatory benefits, HG Co. was acting only after it had been put in peril of insolvency in the equity sense as a result of ULC's attempt to monopolize. HG Co., therefore argues in the language of Justice Clark in Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 623, 73 S. Ct. 872, 97 L.Ed. 1277 that ULC's conduct serves to "illuminate" HG Co.'s intent. HG Co. contends that it had no intent to monopolize; it merely was trying to survive in the face of an unlawful attack. The claim is that even if secret discrimination is *prima facie* a badge of an attempt to monopolize, here the *prima facie* case has been overcome when one recognizes the setting and the necessity of retaliation as self-defense.

■■■ 18. The foregoing argument is not without appeal. Admittedly the provocation to retaliate was great, the total number of discriminations was not shown to be large, the period of the discrimination was short, and paragraph 16 of plaintiff's complaint does not point a finger with praiseworthy clarity at this evil practice. Yet there can be no question that there was discrimination, that it was capricious, that it was secret, that it belied the public rate card, and that it cannot be excused on the plea that the discriminatory offers made by HG Co. merely matched offers made by ULC.

Such a practice was certainly not honestly industrial. (See conclusions 14 and 15, above.) Moreover, it is a practice which is not to be excused because comparable practices were indulged in by plaintiff. See Moore v. Mead Service C., 10 Cir., 190 F.2d 540, 541 approved in footnote 1 of Moore v. Mead's Fine Bread Co., 348 U.S. 115, 116, 75 S.Ct. 148, 99 L.Ed. 145. Cf. Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219. Nor, on the ground that the motive was to retaliate or defend against ULC's illegal conduct, can the practice be regarded as merely a restraint of trade of doubtful validity rather than as an attempt to monopolize. This distinction is unacceptable because having about fifty per cent of the market, and knowing that the market would not permit two contestants to survive, HG Co.'s resort to any unfair practice, and its failure to confine itself to exercise of skill, foresight and industry, compels a conclusion that HG Co. had an exclusionary intent and had attempted to monopolize the market in violation of § 2 of the Sherman Act. (See conclusion 9, above.) Nor can HG Co. escape an adverse decree on the ground that on February 1, 1959 its new management ended the discrimination. This reform came after this suit was brought on January 13, 1959. Plaintiff is entitled to be sure that the reform is not merely temporary.

19. The next question is whether it was indicative of an attempt to monopolize for HG Co. publicly to reduce its rates on February 1, 1959 at a time when it was losing money. Plaintiff's position seems to be either that no reduction was proper, or that the over-all reduction was too substantial, or that reduction in some categories was so much greater than in others that the rate reduction was discriminatory as between publicly announced classes of rates. Nothing in the record supports the last branch of this contention, that is, the suggestion that there was an invidious discrimination between two or more publicly announced rates. And as to the first branches of the contention, a sufficient answer is that it is not unlawful in a market which permits of only one successful competitor, but where two competitors are each struggling at a loss, for one of the competitors to reduce its prices, at least in the absence of a showing that such reduction results in such terrific losses that it is beyond reasonable hope that they can be recovered even in the long future. Had the losses been so extravagant as to be unrecoverable it might be persuasively argued that the object of the reduction was not to capture the market for its possible profit value to the one foreseeable successful competitor, but was rather to inflict injury on a rival regardless of the expectation of ultimate profit. But those are not the facts in the case at bar. Here the effect of the reduction of February 1, 1959 has been not to increase but to diminish HG Co.'s losses.

20. We now come to what is the most important issue in this case—the lawfulness of the defendants' action in organizing NNE and purchasing stock in it so that NNE could buy stock in, and make advances to, HG Co.

21. The findings of fact have explicitly recited (a) that each of those who invested in NNE "acted in part because he believed that * * * investment in NNE was * * * commercially justified", and "the belief * * * was a reasonable belief"; (b) that there is not between any newspaper owned by any NNE shareholder and the newspaper owned (indirectly) by NNE, or between any newspaper owned by any NNE shareholder and any newspaper owned by another NNE shareholder any "linkage of subscriptions, advertisements, contracts, manufacturing processes, news gathering or editorial policy. Nor is any such linkage contemplated"; and (c) none of the relationships which NNE created "substantially affects what is technically known as 'the market power' of any NNE shareholder."

22. The very principle which permitted ULC to use its funds and its Man-

chester plant to establish The Haverhill Journal (see conclusions 5 to 7 above) would seem to permit the NNE shareholders to use their funds to buy indirectly The Haverhill Gazette. Both ULC and the NNE investors had a commercial basis for their decisions. Both avoided substantial operational agreements between their Haverhill and their non-Haverhill enterprises. Neither ULC nor any NNE investor in any substantial way (a) used its non-Haverhill market power within Haverhill or (b) used its Haverhill investment to increase its market power outside of Haverhill. Thus the case at bar seems to be precisely the one envisaged by Professors Carl Kaysen and Donald F. Turner in Anti-Trust Policy, An Economic and Legal Analysis, Harvard University Press, 1959, pp. 138–139 "We would deem the following joint ventures to be presumptively lawful * * * (b) any case in which there is no close relation between the product of the venture and any of the products of the participants * * * Jointness creates no additional risk of market power spreading from one market to another, apart from the pooling of financial resources; and there would be no risk of interrelated price and output decisions as between the venture and the joint venturers."

23. But plaintiff suggests that it makes a difference that many NNE shareholders acted because they did not approve of Loeb's tactics. There is no basis for concluding that this motive was primary in any shareholder's decision to subscribe to NNE. And it does not constitute a violation of § 1 or § 2 of the Sherman Act for a person to make a commercially justified investment in an enterprise in a way that does not substantially increase his market power if he has both a purpose to make money and a purpose to preclude another from capturing a market. As has already been explained in conclusion 9, the Sherman Act permits a person to have an intent to exclude another from the market if this intent is accomplished without resort to predatory or unfair practices. In

a commercial competition, fairly fought, with the making of money a principal object, a contestant is not to be condemned for his anticipated pleasure in seeing the tactics of his opponent thwarted. "One who engages in a business does so for the purpose, broadly, of deriving personal satisfactions of some kind from his conduct. If he engages in the business in good faith, intending to remain in it indefinitely or until a more profitable course presents itself, he is not subject to liability even though one of the satisfactions which it is his purpose to derive is the causing of harm to the business of another." Restatement, Torts § 709, comment c. The law allows other joys in business life beside making money.

24. Plaintiff also suggests that it makes a difference that here we have an investment made by a combination of persons most of whom have in their home markets a so-called monopoly position. But, as the quotation from Professors Kaysen and Turner recited in conclusion 22 emphasizes, the question is not whether in some market somewhere each of a group of persons has a monopoly or other substantial market power, the question is whether they have in some way combined that market power. Here there is no evidence of interlacing of policies, practices or operations of NNE stockholders *inter se* or with HG Co. Each runs a wholly separate enterprise. Each is king in its own city. None has joined an imperial federation holding sway in New England.

25. Finally plaintiff contends that defendants have formed a combination to exclude it and perhaps others from buying any local daily newspaper in any of the cities in which NNE has stockholders. The claim is that what we have here is an incipient mutual defense association. The argument is that those who solicited investment in NNE gave as one of the reasons for investment that "if Loeb succeeded in Haverhill * * * then he * * * might * * * come into their territories"; and that some of those who invested feared lest

they "might at some time be victims of a distress similar or akin to that experienced by The Gazette". But the answer to the argument is that there is no express agreement and, as the findings indicate, there is no adequate basis for inferring an implied agreement, either that some or all of the NNE investors will join in similar ventures in the future if help is needed, or that they will join to preclude plaintiff from buying any New England newspaper except The Haverhill Gazette. There is no large capital to purchase newspapers or to serve as a defense fund. In the common pot there is hardly enough to carry on the Haverhill venture. There is at most a corporate shell NNE Inc., with no formidable weapons concealed behind the imposing facade of its name. If disaster strikes some NNE shareholder, there is no basis for predicting what will happen. Perhaps if there is a victim he will cite the Haverhill precedent. But a precedent is not a promise. Cash contributions to invest in Haverhill do not warrant a conclusion of a combination or conspiracy to act elsewhere.

26. From what has been said it follows that the formation and organization of NNE, the subscription to the stock of NNE, the NNE purchase of HG Co. stock, and the advances by NNE to HG Co. (even though such actions were taken with an awareness that ULC could probably be forced out of the Haverhill market, with the motive of thwarting Loeb's tactics, and with the effect of precluding him from acquiring the stock of HG Co.) did not involve (a) a combination or contract in restraint of trade, nor (b) a monopolization or attempt to monopolize the Haverhill market, nor (c) a monopolization or attempt to monopolize some supposed regional market composed of local daily newspapers in a number of New England cities looked at as though they were in some sense a unity, nor (d) any acquisition which had the effect of substantially lessening competition or had the tendency to create a monopoly. The formation, organization, and functioning of NNE did not involve NNE or those who became officers or stockholders in any violation of § 1 or § 2 of the Sherman Act, or § 7 of the Clayton Act.

*Decree in accordance with opinion.*

### Partial Final Decree

This cause having come on to be heard, and the Court having fully considered the evidence and the arguments, and having filed its Findings of Fact, Conclusions of Law, and Opinion, it is hereby:

Ordered, Adjudged, and Decreed that:

1. The complaint is dismissed on the merits against Newspapers of New England, Inc., Lowell Sun Publishing Co., Eagle Tribune Publishing Co., Enterprise Publishing Co., Essex County Newspapers Inc., Sentinel Printing Co., Eagle Publishing Co., Holyoke Transcript-Telegram Pub. Co., Inc., Republican Publishing Co., John H. Costello, Irving E. Rogers, J. Warren McClure, William F. Lucey, Frank A. Lawlor, Philip S. Weld, David W. Howe, Sidney R. Cook, William Dwight, Donald B. Miller, and George H. Goodbeer.

2. The Haverhill Gazette Co. shall not make or collect any charge for advertising in The Haverhill Gazette except in strict conformity with a publicly announced rate schedule. The corporation shall be free to vary the schedule from time to time. But to be effective an advertising schedule shall set forth *every* aspect of the rates, including, for example, the classification of types of advertising and of advertisers, the basic charges, discounts for volume, discounts for prompt payment, discounts for repetitions of an advertisement, and all types of special benefit available. For the purposes of this paragraph a rate schedule shall be regarded as publicly announced when, alternatively, it is published in The Haverhill Gazette, *or* it is posted in a conspicuous place in the offices of The Haverhill Gazette Co. and is available upon demand by any person who indicates the possibility that he will advertise in or compete with The Haverhill Gazette Co.

3. Union Leader Corporation shall not make or collect any charge for advertising in The Haverhill Journal except in strict conformity with a publicly announced rate schedule. The corporation shall be free to vary the schedule from time to time. But to be effective an advertising schedule shall set forth *every* aspect of the rates, including, for example, the classification of types of advertising and of advertisers, the basic charges, discounts for volume, discounts for prompt payment, discounts for repetitions of an advertisement, and all types of special benefit available. For the purposes of this paragraph a rate schedule shall be regarded as publicly announced when, alternatively, it is published in The Haverhill Journal, *or* it is posted in a conspicuous place in the offices of The Haverhill Journal and is available upon demand by any person who indicates the possibility that he will advertise in or compete with The Haverhill Journal.

4. Union Leader Corporation shall not make to any person whose principal occupation is that of officer, director, partner, employee, or associate of an enterprise that does advertise in The Haverhill Journal any payment for that person's services as a newspaper consultant, or advertising solicitor, or their equivalent unless the person so paid is shown to be by experience and like qualifications a bona fide newspaper consultant, advertising solicitor, or their equivalent, and unless the Union Leader Corporation instructs that person to declare his employment by Union Leader Corporation when that person directly or indirectly solicits advertising for The Haverhill Journal.

5. Union Leader Corporation is ordered not to perform any contract it now has with Martin Bendetson, Norris Bendetson, Jerome Fishbein, David M. Gordon, Vincent W. Grad, Irving P. Karelis, Sidney Katz, and Eli Shoreman. Union Leader Corporation is directed not to retain as an officer William Loeb if hereafter he makes to any of the persons listed any payments similar to the payments of $50 weekly made to each of those persons since May 1958, or if hereafter he performs the contracts of December 15, 1958 which he made with each of those persons, or if hereafter he makes to any person whose principal occupation is that of officer, director, partner, employee, or associate of an enterprise that does advertise in The Haverhill Journal any payment for that person's services as a newspaper consultant, or advertising solicitor, or their equivalent. The phrasing of this paragraph is due solely to the facts that neither Loeb nor any of the other individuals named is a party to this case, and that therefore this Court must direct its order to Union Leader Corporation which is a party. There is no implied suggestion that Loeb and the others will not voluntarily abandon their relationship once the invalidity of their agreements has been judicially declared.

6. Union Leader shall prepare as promptly as possible a detailed schedule (with appropriate references to the transcript of this case, the exhibits introduced, those records of its own affairs and of The Haverhill Gazette Co. which were examined before trial in this case, and other relevant sources) showing the precise damages which it claims it suffered from such discriminations in advertising charges as have been practiced by The Haverhill Gazette Co. If, in the light of the opinion in this case, any other types of damages are recoverable they may also be listed on the schedule. Items of damage not clearly revealed by the schedule shall be regarded as barred in the same manner as claims not made at a pre-trial are frequently barred.

7. The Haverhill Gazette Company shall prepare as promptly as possible a detailed schedule (with appropriate references to the transcript of this case, the exhibits introduced, those records of its own affairs and of Union Leader Corporation which were examined before trial in this case and other relevant sources) showing the precise damages which it claims it suffered from (a) the Union Leader Corporation's actions in inducing advertisers to boycott The Ha-

verhill Gazette, (b) the illegal employment by Union Leader Corporation of Martin Bendetson, Norris Bendetson, Jerome Fishbein, David M. Gordon, Vincent W. Grad, Irving P. Karelis, Sidney Katz, and Eli Shoreman, and (c) such discriminations in advertising charges as have been practiced by Union Leader Corporation in the operation of The Haverhill Journal. If in the light of the opinion in this case, any other types of damages are recoverable they may also be listed on the schedule. Items of damage not clearly revealed by the schedule shall be regarded as barred in the same manner as claims not made at a pre-trial are frequently barred.

8. The Haverhill Gazette Company shall refrain from attempting in any way to monopolize the market in Haverhill for daily local newspapers of high quality.

9. Union Leader Corporation shall refrain from attempting in any way to monopolize the market in Haverhill for daily local newspapers of high quality.

10. Except for (1) the possible recovery of damages to be claimed by the schedules in paragraphs 6 and 7, (2) the trebling of such damages, and (3) attorneys' fees, all other relief sought by either the complaint or the counterclaim is denied.

11. Pursuant to Rule 54 of the Federal Rules of Civil Procedure, 28 U.S.C., this Court expressly determines that there is no just reason for delay in entering final judgments on the following claims:

(a) The claims against all defendants specified in paragraph 1 of this Order;

(b) all claims for injunctive and declaratory relief against The Haverhill Gazette Co.;

(c) all claims for injunctive and declaratory relief against Union Leader Corporation.

Pursuant to those determinations, this Court enters final judgments with respect to paragraphs 1, 2, 3, 4, 5, 8, 9, 10, and 11 of this Order, but reserves the damage claims referred to in paragraphs 6 and 7. However, if an appellate court should regard these orders not as final but as interlocutory, and if the parties would not have the benefit of the appeals available under 28 U.S.C. § 1292(a) (1), this Court, in accordance with 28 U.S.C. § 1292(b), is of the opinion that the orders in paragraphs 1, 2, 3, 4, 5, 8, 9, 10, and 11 involve a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

12. Jurisdiction of this cause is retained for the purpose of enabling any party to apply to this Court at any time for such further orders and directions as may be appropriate for the correction, construction, or carrying out of this decree.

13. This decree shall take effect one week after its entry unless before then its enforcement is superseded by an appellate court.