AMERICAN FOOTBALL LEAGUE et al.,
Appellants,

v.

NATIONAL FOOTBALL LEAGUE et al.,
Appellees.

No. 8780.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 22, 1963.

Decided Sept. 23, 1963.

Warren E. Baker, Washington, D. C. (Chadbourne, Parke, Whiteside & Wolff; David A. Peters, Washington, D. C., Thomas F. O'Toole, New York City, and Albert L. Ledgard, Jr., Washington, D. C., on brief), for appellants.

Gerhard A. Gesell, Washington, D. C. (Hamilton Carothers, Charles W. Havens, III, Washington, D. C., Covington & Burling, Washington, D. C., William D. Macmillan, and Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellees.

Before HAYNSWORTH, BOREMAN and BRYAN, Circuit Judges.

HAYNSWORTH, Circuit Judge.

The American Football League and owners of its franchises are contending against the National Football League and the owners of its franchises for victory in the courts. The American Football League and the owners of its franchises lost in the Court below, when the District Court held that there had been no violation of Sections 1, 2 or 3 of the Sherman Act[1] by the National Football League and the owners of its franchises. We affirm.

The District Court wrote a full and comprehensive opinion, in which the facts are set forth in some detail.[2] The facts need be stated only in summary fashion here, for the reader who desires more detailed information can find it in the District Court's opinion.

The two football leagues, American and National, are unincorporated associations. Each has a commissioner who exercises some executive and administrative authority, but, in each, ultimate control is vested in the owners of the football teams for whose benefit the league exists. In each instance, the team owners are corporations, each of which was the holder of a franchise to operate a professional football team in a designated city. Most of the corporate team owners are controlled and dominated by a single individual, though in a minority of instances the role of the dominant individual is played by a small group of two or three, and in one instance of five. It is these individuals who exercise ultimate control of the leagues with which they are associated.

The National Football League was organized in 1920. For a number of years its existence was precarious. Until the last ten years, its membership was far from static, and until 1946 every major league professional football team operating in the United States was associated with it. In 1945, the All American Football Conference was organized, and it operated through the four seasons of 1946–1949 with eight teams, except that two of the teams were merged in 1949, and in the last season, there were but seven teams. Thereafter the All American Football Conference disbanded, but three of its teams were received into the National Football League, and teams franchised in those three cities, Baltimore, Cleveland and San Francisco, were operated under National League franchises when this action was commenced.[3]

In 1959, the National Football League operated with twelve teams located in eleven cities. There were two teams in Chicago and one each in Cleveland, New York, Philadelphia, Pittsburgh, Washington, Baltimore, Detroit, Los Angeles, San Francisco, and Green Bay, Wisconsin. In 1960, two additional franchises were placed, one in Dallas and one in Minneapolis-St. Paul, the Dallas team beginning play in 1960 and the Minneapolis-St. Paul team in 1961. In 1961,

1. 15 U.S.C.A. §§ 1, 2 and 3.

2. D.C., 205 F.Supp. 60.

3. It is not contended that there was any violation of the antitrust laws by the National Football League in connection with the dissolution of the All American Football Conference. National not only absorbed three teams of the disbanding conference, but it entered into certain agreements respecting disposition of player contracts of other teams of the Conference. Such contracts have not been attacked, however, and there has been no showing that whatever monopoly power is possessed by National or its affiliated teams was unlawfully acquired.

one of the Chicago teams, the Cardinals, was transferred to St. Louis.

The American Football League was organized in 1959, and began with a full schedule of games in 1960. Affiliated with it were eight teams located in eight cities, Boston, Buffalo, Houston, New York, Dallas, Denver, Los Angeles and Oakland. After the 1960 season, the Los Angeles team was moved to San Diego.

In the first half of the 1952 season, a team operated under a National League franchise in Dallas. It failed and was replaced by a team located in another city, but a few years later there was substantial interest in Texas as a fruitful area for professional football.

Many of the National League owners were interested in expanding the league. Halas, owner[4] of the Chicago Bears, was the earliest and most ardent advocate of expansion. Early in 1956, he predicted that National would expand from twelve to sixteen teams during the period of 1960–1965. In July 1957, Bert Bell, National's Commissioner, predicted some expansion by 1960, and at National's annual meeting in January 1958, an expansion committee was appointed composed of Halas and Rooney, owner of the Pittsburgh Steelers. Marshall, of the Washington Redskins, was an implacable foe of expansion, but the District Court found, with reason, that by 1959 a majority of the owners were in favor of expansion to sixteen teams and the granting of four additional franchises, two at a time.

As the National League contemplated expansion, the interest of the owners centered on Houston, Dallas, and two or three other cities. The weather in the Southwest was particularly favorable, and, with the improvement of the financial condition of the National League teams and the increasing revenues they received from television, it was thought that Houston and Dallas, with their nat-

ural rivalry, could each support a team. Those two cities were considered by National's owners as the most likely prospects for expansion, with Minneapolis-St. Paul, Buffalo and Miami close behind.

Meanwhile, there were people actively interested in acquiring franchises to operate National League teams in Houston and Dallas. Clint Murchison, Jr. and his father, of Dallas, had sought to purchase the San Francisco 49'ers, the Washington Redskins and the Chicago Cardinals, intending, if successful in acquiring one of those teams, to move it to Dallas. In 1957 and 1958, Lamar Hunt, of Dallas, and the Houston Sports Association applied to National for franchises to operate teams in those two cities. Hunt also sought to acquire the Chicago Cardinals and move that team to Dallas. Early in 1959, Murchison and Hunt (Dallas) and Cullinan, Kirksey and Adams (Houston Sports Association) were all actively seeking National League franchises. They were given encouragement by Bell, Halas and Rooney, all of whom were talking in terms of expansion into Houston and Dallas about 1961.

In February and April 1959, Halas held press conferences to stimulate sales of tickets to a preseason game between the Chicago Bears and the Pittsburgh Steelers, scheduled to be played in Houston in August. In those press conferences, he discussed expansion plans, predicting that expansion would begin about 1960, and that the most likely cities were Houston, Dallas, Miami and Buffalo. Upon inquiry by Murchison, Halas suggested that he plan to make a formal application for a Dallas franchise to be considered at National's annual meeting in January 1960.

Meanwhile, in the spring of 1959, Hunt, of Dallas, decided that a new league was feasible and could be successfully organized. He had been told by Bell that he might submit a formal application for the Dallas franchise at the January 1960

4. As in other instances, the owner was actually a corporation, but Halas was the dominant individual in the Chicago Bears Football Club, Inc., and those dominant individuals at league meetings, and otherwise, were, generally, referred to as the owners, and the term is adopted here for convenience.

annual meeting. However, he was either unsure of National's expansion into Dallas, of when it would occur, or of his chances of obtaining the franchise in competition with Murchison.[5]

The remainder of 1959 was very eventful. Hunt proceeded actively with his plan to organize a new league. In July, he disclosed his intention to Commissioner Bell. On July 28, Bell, with Hunt's permission, told a congressional committee of Hunt's plans, and stated that the National League owners favored organization of the new league. Early in August, Hunt and Adams publicly announced the formation of the new league, with teams owned by them to be located, respectively, in Dallas and Houston. Hunt and his associates were actively in touch with interested persons in a number of other cities. On August 22, representatives from Los Angeles, Dallas, Houston, New York, Minneapolis and Denver signed articles of association. Representatives from many other cities had been in touch with Hunt. Wilson, of Detroit, sought an American franchise for Miami, and later for Buffalo, and the Buffalo franchise was formally granted in October. In November, an application for a franchise to be placed in Boston was approved. Thus, in late November, American had tentative arrangements for teams in Houston, Dallas, Minneapolis, New York, Boston, Denver, Buffalo and Los Angeles.

In the meanwhile, Murchison, of Dallas, and Cullinan and Kirksey, who had been associated with Adams in efforts to obtain a National franchise for Houston, continued their efforts to obtain National franchises for those two cities. In late August, at their insistence, Halas, with the approval of a number of National owners, publicly announced that National's expansion committee would recommend to the 1960 meeting franchises for Dallas and Houston to begin play in 1961, the Houston franchise to be conditioned upon the availability of an adequate stadium. Construction of a new stadium in Houston was in contemplation, and there was hope that a National League team might obtain use of the Rice University Stadium until a new municipal stadium was constructed and available. Just after the death of Commissioner Bell on October 11, 1959, the National League owners met informally and agreed to adopt the announced recommendation of the expansion committee. This was followed by a widely publicized press release announcing that the National League would grant two new franchises in 1960, one of them to go to Dallas and the other to Houston if an adequate stadium was made available in Houston.

In October, however, it became known that the Rice University Stadium would not be made available for use by a National League team, and all further consideration of a National League franchise in Houston was then abandoned.

A number of people in Minnesota had been seeking a National League football team, but after Hunt's plans for a new league had been disclosed to them, Winter, Boyer and Skoglund, of Minneapolis, entered into American's Articles of Association, which were executed in August 1959. Winter, however, remained in touch with representatives of the National League, as did Johnson, an influential Minneapolis newspaperman. Johnson and Winter preferred a National League team to an American League team, but, on August 22, 1959, they had no assurance that the National League would place a franchise in Minnesota at any reasonably foreseeable date. They must have retained some hope their preference for the National League might be real-

5. Hunt met with Commissioner Bell and Donohue, one of the owners of the Philadelphia Eagles, on June 3. Hunt did not then disclose his purpose to organize a new league, but they discussed in some detail the operation of professional football teams in the National League. Hunt testified that at that meeting Bell said there was no likelihood of National's expansion, but, on conflicting evidence, the District Court found that Bell made no such statement, though Bell may have expressed an opinion that there was no likelihood of expansion in 1960.

ized, however, when National's announcements of its intention to place a team in Houston were conditioned upon the availability of an appropriate stadium, coupled with prominent mention of Minneapolis in connection with National's later expansion to sixteen teams. When it became known that an appropriate stadium in Houston was not available, Johnson and Winter sought definite commitments from the National League. They obtained telegraphic commitments in November. Winter, Skoglund and Boyer failed to deposit the performance bond of $100,000, which was required of American League members in November, but, thereafter, Skoglund and Boyer sought to obtain leases from the Minneapolis Stadium Commission for an American League team. The Commission refused to enter into such lease arrangements until the placement of a National League team in Minneapolis-St. Paul was settled.

In January 1960, Winter, of Minneapolis, and Haugsrud, of Duluth, formally applied to the National League for a franchise. Boyer joined in its presentation, stating that he had withdrawn from the American League and had obtained a complete release and a return of the $25,000 deposit, which he, Winter and Skoglund had made. At National's annual meeting on January 28, 1960, franchises were granted to Dallas and Minneapolis-St. Paul, the grant to Minneapolis-St. Paul being conditioned upon the enlargement of the Minneapolis stadium and the sale of 25,000 season tickets for the 1961 season when play was to commence. The Dallas franchise, however, permitted it to operate in 1960, for Murchison was very anxious that his National League team commence play in Dallas in the same year Hunt's American League team commenced play there.

On the next day, the American League had its annual meeting, during which it granted a franchise to Oakland, which took the place of Minneapolis-St. Paul. The American League owners preferred Oakland to other applicants, because they wanted a second team on the West Coast and because they regarded the Oakland area as promising.

It thus came to pass that in the 1960 season, teams of the two leagues were in direct competition in New York, Dallas, Los Angeles, and in the San Francisco-Oakland area. Each league had teams in other cities in which there was no direct competition between the leagues. The two leagues were competing on a national basis for television coverage, outstanding players and coaches, and the games of each league competed for spectators with the televised broadcast of a game of the other.

The first and most important question on appeal, therefore, is a review of the District Court's determination of the relevant market. The District Court recognized that the two leagues and their member teams competed with each other in several ways, and that the relevant market with respect to one aspect of their competition would not necessarily be the relevant market with respect to another. Since each league recruited players and coaches throughout the nation, he concluded that the relevant market with respect to their competition in recruiting was nationwide. He necessarily found that their competition for nationwide television coverage, with a blackout only of the area in which the televised game was played, was nationwide. As for the competition for spectators, he found the relevant market to be those thirty-one metropolitan areas in the United States having a population of more than 700,000 people according to the 1960 census. This determination was based upon testimony that a metropolitan area of that size might be expected to support a major league professional football team. Indeed, Hunt, of the American League, had testified that a metropolitan area of 500,-000 might support such a team. The District Court's determination was influenced by American's contention that the bare existence of the National League and its member teams foreclosed certain markets to it and limited its capacity to operate successfully. It is reinforced by

the evidence of many applications from other cities which were actively pressed upon American, some of which, at least, were thought worthy of real consideration.

In addition to those cities in which American actually placed franchises, Hunt testified that there was substantial interest in a franchise in Vancouver, Seattle, Kansas City, Louisville, Cincinnati, Philadelphia, Jacksonville, Miami, Atlanta, St. Louis and Milwaukee. The eighth franchise was placed in Oakland only after consideration of the "strong case" made by Atlanta. In short, it abundantly appears that cities throughout the United States and one Canadian city were actively competing for league franchises, there being many more applicants than available franchises.

In this Court, the plaintiffs contend that the relevant market is composed of those seventeen cities in which National now either has operating franchises, or which it seriously considered in connection with its expansion plans in 1959. They would thus include in the relevant market, New York, Chicago, Philadelphia, Cleveland, Pittsburgh, Washington, Los Angeles, San Francisco, Baltimore, Detroit and Green Bay, in which National teams were operating in 1959, plus Dallas and Minneapolis-St. Paul, in which franchises were authorized in 1960, plus Houston, Buffalo and Miami, which were considered by National for expansion, and St. Louis, to which the Chicago

Cardinals were transferred in 1961 after American's first operating season. They include in the relevant market all of the closed cities in which there is a National League team, but no American League team, but exclude from the relevant market all of those closed cities in which there is an American League team but no National League team, and all of those other cities in which there is now no major league professional football team, but which would be hospitable to a franchise and which have a potential for adequate support of a professional football team. They advance the unquestioned principle that the relevant market should be geographically limited to the area in which the defendants operate, or the area in which there is effective competition between the parties.[6]

■ In very different contexts, the relevant market has been found to be a single city,[7] a group of cities,[8] a state,[9] or several states.[10] In considering an attempt to monopolize, it, of course, is appropriate to limit the relevant geographic market to the area which the defendant sought to appropriate to itself, and, if monopoly power has been acquired in a separably identifiable and normally competitive market, it is irrelevant that the defendant did not possess the same monopoly power in an unrelated market elsewhere.

Plaintiff's contention here, however, is a simple fractionalization of a truly na-

---

6. Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580; Standard Oil Co. of Cal. & Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371. Cf. United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L.Ed. 2010; Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 55 S.Ct. 182, 79 L.Ed. 356.

7. Gamco, Inc. v. Providence Fruit & Produce Bldg., Inc., 1 Cir., 194 F.2d 484; Union Leader Corp. v. Newspapers of New England, Inc., D.Mass., 180 F.Supp. 125, 129, modified, 1 Cir., 284 F.2d 582.

8. United States v. Griffith, 334 U.S. 100, 106-109, 68 S.Ct. 941, 92 L.Ed. 1236; Schine Chain Theatres, Inc. v. United

States, 334 U.S. 110, 116, 68 S.Ct. 947, 92 L.Ed. 1245; United States v. Yellow Cab Co., 332 U.S. 218, 224-226, 67 S.Ct. 1560, 91 L.Ed. 2010; United States v. National City Lines, Inc., 7 Cir., 186 F. 2d 562, 567-568.

9. Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236-237, 68 S.Ct. 996, 92 L.Ed. 1328.

10. Appalachian Coals, Inc. v. United States, 288 U.S. 344, 375-376, 53 S.Ct. 471, 77 L.Ed. 825; United States v. Columbia Steel Co., 334 U.S. 495, 508-514, 520, 68 S.Ct. 1107, 92 L.Ed. 1533; Indiana Farmer's Guide Publishing Co. v. Prairie Farmer Publishing Co., 293 U.S. 268, 278-280, 55 S.Ct. 182, 79 L.Ed. 356.

tional market. Each league has teams franchised to cities on the Atlantic, on the Pacific and in the midlands. Each team in each league travels back and forth across the country to play before many different audiences in many different cities. Most of the official season games are played in a city in which there is a franchised team, but that is not invariable,[11] and most of the preseason exhibition games are played in cities in which there is no franchised team. In locating franchises, neither league has restricted itself to any geographic section of the country or limited itself to any particular group of cities. In American's brief history, it has moved one team from Los Angeles to San Diego, and the many changes which have occurred in National's franchises belie any notion of geographic limitation.

Though we may concentrate our attention upon competition between the leagues for franchise locations and lay aside for the moment clearly national aspects of their competition for players, coaches and television coverage, location of the franchise is only a selection of a desirable site in a much broader, geographically unlimited market. It is not unlike the choice a chain store company makes when it selects a particular corner lot as the location of a new store. It preempts that lot when it acquires it for that purpose, but, as long as there are other desirable locations for similar stores in a much broader area, it cannot be said to have monopolized the area, or, in a legal sense, the lot or its immediate vicinity.

The National League was first upon the scene. In 1959, it had franchises in eleven cities, the two Chicago teams being in direct competition with each other. It now has franchises in fourteen cities, some of which the District Court found capable of supporting more than one professional football team. Obviously, the American League was of that opinion, for it placed teams in New York, Los Angeles, and the San Francisco-Oakland area, where National, at the time, had well established teams. Most of the other cities in which each league operates, however, are incapable of supporting more than one professional football team. In such a city, a professional football team, once located there, enjoys a natural monopoly, whether it be affiliated with the National or American League, but the fact that National had teams located in such cities before American's advent does not mean that National had the power to prevent or impede the formation of a new league, or that National's closed cities should be included in the relevant market if American's closed cities are to be excluded. The fact is that the two leagues are in direct competition for regular season spectators only in New York, Dallas, and the San Francisco-Oakland area, and, during the 1960 season, in Los Angeles. If the relevant market is not to be limited to those cities, it must be, geographically, at least as broad as the United States, including Hawaii and portions of Canada.[12]

Though there may be in the nation no more than some thirty desirable sites for the location of professional football teams, those sites, scattered throughout the United States, do not constitute the relevant market. The relevant market is nationwide, though the fact that there are a limited number of desirable sites for team locations bears upon the question of National's power to monopolize the national market.

The District Court's finding that National did not have the power to monopolize the relevant market appears plainly correct. In 1959, it occupied eleven of the thirty-one apparently desirable sites for team locations, but its occupancy of some of them as New York and San Francisco-Oakland was not exclusive, for those metropolitan areas were capable of supporting more than one

---

11. Green Bay, for instance, regularly plays a number of its games in Milwaukee, approximately 120 miles from Green Bay.

12. There was interest in a franchise for Honolulu. Vancouver's interest in obtaining an American franchise has been previously mentioned.

team. Twenty of the thirty-one potentially desirable sites were entirely open to American. Indeed, the fact that the American League was successfully launched, could stage a full schedule of games in 1960, has competed very successfully for outstanding players, and has obtained advantageous contracts for national television coverage strongly supports the District Court's finding that National did not have the power to prevent, or impede, the formation of the new league. Indeed, at the close of the 1960 season, representatives of the American League declared that the League's success was unprecedented.

■ American advances a theory, however, that, since the National League won Minneapolis-St. Paul in competition with American, National could have taken several other cities away from American had it undertaken to do so. This is only a theory, however, unsupported by evidence. It ignores the fact that American won Houston over National's competition, and that each league has won one and lost one in their direct competition for franchise locations. It ignores the fact that National was committed to expansion from twelve to sixteen teams in two separate steps, two teams at a time, so that it had but two franchises to place at the time American was being organized. American questions the finding that sixteen teams is a maximum that one league can efficiently accommodate, but the finding is based upon evidence and was not clearly erroneous. In short, there is no basis for a contention that the evidence required a finding that National, had it wished, could have placed a team in every location sought by American, or in a

sufficient number of them to have destroyed the league.

■■ American complains that National, the first upon the scene, had occupied the more desirable of the thirty-one potential sites for team locations. Its occupancy of New York and San Francisco-Oakland was not exclusive, however, and the fact that its teams in other locations, such as Baltimore and Washington, enjoyed a natural monopoly does not occasion a violation of the antitrust laws [13] unless the natural monopoly power of those teams was misused to gain a competitive advantage for teams located in other cities, or for the league as a whole [14]. It frequently happens that a first competitor in the field will acquire sites which a latecomer may think more desirable than the remaining available sites, but the firstcomer is not required to surrender any, or all, of its desirable sites to the latecomer simply to enable the latecomer to compete more effectively with it. There is no basis in antitrust laws for a contention that American, whose Boston, Buffalo, Houston, Denver and San Diego teams enjoy natural monopolies, has a right to complain that National does not surrender to it other natural monopoly locations so that they too may be enjoyed by American rather than by National. When one has acquired a natural monopoly by means which are neither exclusionary, unfair, nor predatory, he is not disempowered to defend his position fairly.[15]

American also charges the defendants with an attempt to monopolize. They say that National offered franchises to be located in Dallas and Houston, and later to Minneapolis-St. Paul in substitution for

13. See United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416. See also Union Leader Corp. v. Newspapers of New England, Inc., D.Mass., 180 F.Supp. 125, modified 1 Cir., 284 F.2d 582; United States v. Harte-Hanks Newspapers, Inc., N.D.Texas, 170 F.Supp. 227.

14. Cf. United States v. Griffith, 334 U.S. 100, 106–109, 68 S.Ct. 941, 92 L.Ed. 1236; Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 116, 68 S.Ct. 947, 92 L.Ed. 1245; Union Leader Corp. v.

Newspapers of New England, Inc., D. Mass., 180 F.Supp. 125, 129, modified, 1 Cir., 284 F.2d 582.

15. Union Leader Corp. v. Newspapers of New England, Inc., 1 Cir., 284 F.2d 582; United States v. Aluminum Co. of America, 2 Cir., 148 F.2d 416, 429–30; United States v. E. I. Du Pont De Nemours, D.Del., 118 F.Supp. 41, 213–18, 223, aff'd on other grounds, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264.

132

Houston, for the sole purpose of preventing organization of the American League. It relies upon certain statements made by Marshall, of the National League Washington Redskins, and it discounts all of National's earlier discussion of its expansion plans as froth designed to influence congressional action upon a pending bill granting certain exemptions from the antitrust laws to professional football.[16]

█ It is true that a lobbyist for the Sports Bill had informed the National League owners that expansion of the National League, or plans for its expansion, would be helpful in developing congressional support for the bill, particularly among Congressmen from the areas affected by the expansion. It is also true that after National's absorption of three teams from the All American Conference in 1950, there was little talk in the National League of expansion until after the Supreme Court's decision in Radovich [17] in 1957. Early in 1956, however, Halas had predicted that National would expand from twelve to sixteen teams during the period, 1960–1965. Later, as indicated above, there was much discussion of it and much of it public. The remaining years of the 50's were consistently referred to as a period of consolidation, while the early years of the 60's were to witness the expansion of the league from twelve to sixteen teams in two separate steps. These declarations had gone so far and had become so specific that National would have greatly embarrassed itself if it had not undertaken their execution, though American had

never appeared upon the scene. Moreover, the District Court found that there was substantial business and economic reasons for advocacy by National League owners of the planned expansion.[18] The statement attributed to Marshall, of the Washington Redskins, that he had heard of no reason for expansion except to prevent formation of the American League, the District Judge found to be untrue, for Marshall had been present when business and economic reasons for the expansion had been discussed.[19] Marshall, himself, consistently opposed expansion, though at the 1960 meeting, after some personal differences with Murchison and some of Murchison's associates had been adjusted, he acquiesced in the granting of franchises to Dallas and Minneapolis-St. Paul. Marshall may have made the statement attributed to him, but, in light of his opposition to expansion and the evidence of business considerations which induced other National League owners to advocate expansion, the District Court was not required to find that Marshall's statement was true. On the contrary, the District Court's finding is abundantly supported by the evidence, particularly in light of the fact that what the National League did in 1959 and 1960 was simply to implement on schedule the plans it had announced much earlier.

The plaintiffs also charge as conspiratorial acts certain suggestions which were considered by some of the owners of each league during the late summer and autumn of 1959.

16. The "Sports Bill" was introduced after the Supreme Court's decision in Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456, which condemned the black listing of a player who broke his employment contract.

17. Supra, n. 16.

18. It is elementary that in order to find the offense of conspiracy or attempt to monopolize, there must be a specific, subjective intent to gain an illegal degree of market control. Times-Picayune Publishing Co. v. United States, 345 U.S. 594,

626, 73 S.Ct. 872, 97 L.Ed. 1277; United States v. Griffith, 334 U.S. 100, 105, 68 S.Ct. 941, 92 L.Ed. 1236; American Tobacco Co. v. United States, 328 U.S. 781, 814, 66 S.Ct. 1125, 90 L.Ed. 1575; Swift & Co. v. United States, 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518.

19. Marshall testified he had heard the other owners discuss the business reasons which prompted their advocacy of expansion. The plaintiffs had conceded that Marshall was not a member of any conspiracy or attempt to monopolize, and he was not defending himself on that charge.

Both Hunt and Murchison, of Dallas, were naturally concerned about the impending direct competition between the two Dallas teams. The Pauleys, of the National League's Los Angeles Rams, and Hilton, of the American League's Los Angeles Chargers, were similarly concerned about their direct competition in Los Angeles. Hunt and Murchison, both well-known businessmen of Dallas, were well acquainted with each other, while the Pauleys and Hilton were friends and business associates in Los Angeles, and, naturally, they discussed the problem among themselves. Hunt also travelled about the country to meet in New York with Rosenbloom, the owner of National's Baltimore Colts, with Halas in Pasadena, California, and, later, in Chicago and with others. There were also conversations between Anderson, the owner of National's Detroit Lions and Wilson, a resident of Detroit, a friend of Anderson's and a stockholder of the Lions, who was also the owner of American's Buffalo Bills. Murchison attended some of the conversations in which Hunt participated with others.

During these several conversations, the first of which was held upon arrangements made during a telephone call placed by Hunt to Murchison, Murchison expressed a willingness to let Hunt join him as a co-owner of the National League team in Dallas. Later, Murchison indicated to Hunt that he would be willing to step aside entirely, so that Hunt might become the sole owner of the National League team in Dallas, but costly competition in Dallas was not so easily avoided, for Hunt declined such suggestions on the ground that he felt committed to other American League owners. This led to some suggestions that the ambitions of other American League owners might be met by their becoming owners of National League teams. In light of National's planned expansion to sixteen teams, the suggestion was made that Adams, of Houston, might be a participant in a National League team in that city and the two remaining franchises would go to Minneapolis-St. Paul and to Wilson for a team to be placed in Buffalo or Miami. Nothing came of any such suggestions, however, for no National League owner-participant in the discussions was willing to consider a franchise for Denver, nor were they willing to consider enlargement of their expansion plans to include more than sixteen National League teams. At one time it was suggested that a fifth American League owner might be able to purchase the Chicago Cardinals and thus realize his ambition to become the owner of a major league football team, but, as the District Court found, there was never any indication that the National League would consider incorporating more than four new teams.

■ The District Court found that these conversations were not conspiratorial acts by National League owners. The evidence supports the finding. They grew out of informal talks among friends and business associates about their mutual problems, particularly in Dallas and Los Angeles. As the District Court found, they appeared to be welcomed by participants in them on both sides, but they were not originally initiated by any National League owner, and, as they evolved, the National League owners never indicated more than a willingness to consider some accommodation of ambitions of American League owners through National's previously announced expansion plans. There was nothing in the nature of a concerted campaign by National League owners to thwart the ambitions of American League owners or to destroy the American League. In light of the previously existing relationships between Murchison and Hunt, the Pauleys and Hilton, and Anderson and Wilson, it would have been very surprising if some such informal discussions had not taken place between them. Indeed, it is interesting that in March 1960, Wilson, then in Miami, wrote to Anderson, of the Detroit Lions, warmly thanking him for all of the information and advice that Wilson had received and utilized in setting up a successful organization for his Buffalo Bills, a spirit of friendly and

helpful advice which was evidenced by many other National League owners in conversations with Hunt and other American League owners from the beginning.

██ The witnesses disagreed as to precisely what was said in some of the informal conversations in which the possibility that National might grant franchises to some American League owners was discussed, though at times the dispute was limited to the person who initiated the particular conversation, or to the origin of a particular suggestion. Here, we view the evidence most favorable to the finding, and, so viewed, the District Court's finding that these conversations were not conspiratorial acts on the part of National League owners is clearly supported by substantial evidence.

Finally, the plaintiffs attack some of the specific and ultimate findings as being inconsistent with notes made by Halas during, or immediately after, numerous conversations in which he particpated. We find no such inconsistency, however, between the notes and the findings or between the notes and the testimony of Halas at the trial. Isolated statements in the notes from which the plaintiffs would draw an inference that Halas was attempting to destroy the American League, are equally consistent with the finding that Halas intended no more than aggressive competition when the interests of the two leagues met in direct conflict, as when they were in open competition for Minneapolis-St. Paul. Indeed, we have reviewed all of the evidence and conclude that the District Court's findings are adequately supported, and, under Rule 52 of the Federal Rules of Civil Procedure, we could not disregard them if we would.

We conclude, therefore, that the District Court properly held that the plaintiffs have shown no monopolization by the National League, or its owners, of the relevant market, and no attempt or conspiracy by them, or any of them, to monopolize it or any part of it. No violation of the Sherman Act having been established, the judgment of the District Court is affirmed.

Affirmed.