Neil T. SHAYNE, Plaintiff,

v.

NATIONAL HOCKEY LEAGUE et al., Defendants.

No. 71 C 1537.

United States District Court,
E. D. New York.

Dec. 22, 1980.

Julien, Schlesinger & Finz, New York City, for plaintiff; Leonard Leigh Finz and Alan W. Clark, New York City, of counsel.

Simpson, Thacher & Bartlett, New York City, for defendants; Roy L. Reardon and Ronald L. Ginns, New York City, of counsel.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This is an action for injunctive relief and recovery of $30,000,000 treble damages for business injuries allegedly sustained by

plaintiff as a result of defendants' claimed violations of the federal antitrust laws. Following protracted pretrial proceedings, which finally occasioned a motion by defendants to dismiss the action for plaintiff's prolonged failure to prosecute and his disregard of orders of the court, the action proceeded to trial before the court without a jury in July 1979. The court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P., follow.

## The Parties and Claims

Plaintiff is an attorney practicing in Nassau County, Long Island, and the surrounding metropolitan area, and is well known in the field of litigation. He has also engaged in other business ventures from time to time and has obtained financing through public stock offerings. The defendants are the National Hockey League ("NHL"), the member clubs which constitute the league, and individual principals associated with those clubs. The NHL itself is an unincorporated not-for-profit association organized under the laws of Quebec, Canada, and having its principal place of business and headquarters in Montreal, Canada. In reality the league is an association of individuals and firms engaged in conducting an organized schedule of professional hockey games in indoor arenas located in cities in the United States and Canada. Its affairs are managed by a Board of Governors composed of a principal officer or shareholder from each of the member clubs.

Commencing in or about 1971, defendants are alleged to have monopolized the business of professional hockey and, in particular, conspired to prevent plaintiff from forming his own professional hockey club under the aegis of a newly organized rival league, the World Hockey Association ("WHA"). More specifically, it is plaintiff's claim that defendants foreclosed his threatened competition on Long Island by creating an NHL franchise for a new hockey club to play in the Nassau County Veterans Memorial Coliseum ("Coliseum"), then nearing completion, in which plaintiff was also seeking to install a proposed WHA hockey team. The defendants, denying any violation of the antitrust laws or conspiracy against plaintiff, contend that plaintiff's claims must be judged in light of the relatively undisputed developments in professional hockey over the years, the role of the Nassau County authorities in control of the Coliseum, and plaintiff's inability to meet their requirements for a professional sports program which would satisfy the demands of a sophisticated suburban market and assure the financial viability of the Coliseum as a public enterprise.

## The Business of Professional Hockey

■ Professional hockey like other major sports is undoubtedly a business engaged in interstate commerce and subject to the federal antitrust laws.[1] As in the case of professional football and basketball, the advent of television stimulated widespread interest in ice hockey and created a growing demand for the establishment of professional hockey clubs in major cities throughout the United States and Canada. Thus the NHL, which was founded in 1917 and in 1965 had only six clubs (Boston, Chicago, Detroit, New York, Montreal and Toronto), announced a major expansion program in 1965 which doubled the number of clubs by granting franchises for teams in Oakland, Los Angeles, Minneapolis, Philadelphia, Pittsburgh and St. Louis. After the new teams began operating in 1967, a further expansion was announced in 1969 which brought the cities of Buffalo and Vancouver, Canada, into the NHL, making a total of fourteen clubs playing during the 1970 hockey season. The league's established policy was to expand in multiples of two clubs to provide for full scheduling, so that each member team would have another club to play at any one time.

The expansion of the NFL was not simply a matter of authorizing the formation

1. See, e. g., Philadelphia World Hockey Club v. Philadelphia Hockey Club, 351 F.Supp. 462 (1972); American Football League v. National Football League, 205 F.Supp. 60 (D.Md.1962), aff'd, 323 F.2d 124 (4th Cir. 1963).

of new clubs. Large financial investments were required of the new franchisees in order to acquire the right not only to play with the established NHL teams under the NHL name but also to draft the requisite number of talented hockey players already under contract with the existing clubs. In 1967 each of the six new clubs had to pay the NHL a fee of $2,000,000 for those purposes. In 1969 Buffalo and Vancouver each had to pay a franchise fee of $6,000,000 for the right to enter the league and obtain players. These sums were distributed among the existing clubs to compensate them for the transfer of valuable players and were exclusive of other substantial costs of operating a new franchise such as, for example, indemnification of clubs for territorial infringement and claims of any minor professional leagues operating within the new franchisee's territory.

### NHL Expansion to Long Island

In early November 1971 the Board of Governors of the NHL voted to grant franchises for two additional hockey clubs to begin play in the 1972–73 season, one to be located on Long Island and the other in Atlanta, Georgia. The decision to expand to Long Island gave rise to plaintiff's action, which was filed November 29, 1971.

Although it is plaintiff's claim that the intent of the NHL action was to foreclose his competition as a proposed WHA franchisee in the New York metropolitan area, it is indisputable that the genesis of the NHL Long Island franchise began in 1968, some three years prior to the formation of the WHA. Its progenitor was Eugene Nickerson, then Nassau County Executive and a hockey fan. Nickerson was acquainted with defendant William M. Jennings, a New York attorney, who was president of the New York Rangers NHL hockey club and a member of the NHL Board of Governors. It was Nickerson who first informed Jennings that a major municipal sports arena, the Coliseum, was under construction in Nassau County and of Nickerson's desire to have an NHL hockey team and a National Basketball Association team playing there when it opened.

In November 1970, Ralph Caso was elected Nassau County Executive, succeeding Nickerson in office on January 1, 1971. Like his predecessor, he was desirous of having major sports attractions for the Coliseum when it was completed. To accomplish that objective Caso obtained the assistance of William Shea, a New York attorney and sports figure, in the capacity of unpaid sports advisor for the new Coliseum. Shea was widely known for his success in bringing National League baseball back to New York and his representation of leading sports figures. He also had NHL connections as a director of a California corporation which owned the NHL Los Angeles Kings hockey team, whose president, Jack Kent Cooke, was a member of the NHL Board of Governors. Shea's mission for Nassau County was to provide advice and assistance in obtaining major league professional hockey and basketball teams in time for the projected opening of the Coliseum in late 1972.

Shea lost no time in getting to work. In early December, 1970—before Caso assumed office—Shea broached the subject to Jennings when they met at a Madison Square Garden sports event. Jennings initially was not in favor of a Long Island NHL team, fearing its effect upon his own New York Rangers whose territory included Long Island. Jennings suggested that the Rangers' farm club could play minor league teams in the Coliseum but Shea "was totally uninterested." Instead, as Jennings put it, "he got more forceful," saying " 'I don't have to draw you a diagram as to the type of pressures that could be put on Madison Square Garden' " if Jennings did not support an NHL team for the Coliseum (Tr. 763).

At trial, Jennings, who was called as a witness for plaintiff, testified that he construed Shea's remarks as a threat of possible litigation or a Nassau County citizens' boycott of Madison Square Garden. Whatever Shea meant, the desired effect was achieved. Jennings and defendant Irving Felt, then Chairman of the Board of Madi-

son Square Garden Corporation, decided that the Garden should support an NHL team for the Coliseum provided the New York Rangers were indemnified in the sum of $5,000,000 for permitting another NHL franchise within their territory. On January 15, 1971, Jennings informed Shea of this decision and thereafter, during the first few months of 1971, discussed further expansion of the NHL with other members of the Board of Governors in an attempt to gain support for the proposal. Meanwhile, Shea sent material concerning Nassau County to NHL President Clarence F. Campbell and discussed with other NHL owners the possibility of a franchise on Long Island.

Contemporaneously with Nassau County's interest in an NHL franchise, the owner of a new arena being constructed in Atlanta, Georgia was also pursuing a similar objective. In March 1971, Jennings visited Atlanta and was informed that the arena would be completed by 1972 and of the owner's desire to have an NHL team in time for the opening. Caso and Shea were aware of the Atlanta development and regarded it as favorable to the interests of Nassau County because of the NHL desire to avoid the scheduling problems created by having an odd number of teams.

In early June 1971 the question of expansion was on the agenda for a Board of Governors meeting. The subject was deferred, however, because the meeting had already run its normal two-day course and Jennings did not feel secure about obtaining the necessary agreement. In late June, Jennings and Campbell visited the Coliseum site and met with Caso, Shea and other officials, all of whom pressed for a 1972 franchise. Shea understood that the NHL was receptive and that progress was being made. At the time of this meeting, neither Nassau County nor NHL officials had any knowledge of the existence of the WHA or of plaintiff.

### Formation of WHA and Entry of Plaintiff

Although WHA was organized in California in June 1971, there was no public an-

nouncement until the middle of September when an article appeared in The New York Times which characterized the new league as a "threat" to the NHL. Plaintiff, however, learned of the WHA in or prior to July 1971, at which time he communicated with its representatives about the possibility of acquiring a WHA franchise.

In late September 1971, plaintiff attended an owners' meeting in Los Angeles but limited his interest at that time to obtaining only an option to acquire a WHA franchise for the New York City metropolitan area, including Queens, Nassau and Suffolk Counties, and extending into New Jersey, Connecticut and Pennsylvania. Under the specific terms of the option, which was to expire January 1, 1972, plaintiff could acquire the entire WHA territory extending 100 miles from Columbus Circle in New York City, and including Hartford, Connecticut. For this he paid $5,000 of the total $25,000 purchase price of the option, with the balance to become due upon its exercise. To exercise the option, however, plaintiff was required to submit "to the founders [of the WHA] ... evidence that you will have a suitable facility and adequate dates available to accommodate approximately thirty-five (35) home hockey games." PX 1, ¶ 7.3.

Upon plaintiff's return from Los Angeles, he made his first contact with Nassau County authorities by telephoning James Wells, Nassau County Commissioner for Commerce and Industry, and writing him a letter dated September 27, 1971, with copies to County Executive Caso and William Shea. PX 2. Therein he stated he was "owner" of the WHA New York franchise and requested 39 playing dates at the Coliseum commencing in October 1973. He also stated that he needed a commitment for 35 playing dates prior to January 1, 1972, to comply with the terms of his contract with the WHA. Similar letters and requests for playing dates were sent to Governor William Cahill of New Jersey and William Lillyman of the Hartford Arena. PX 3, 6.

Although plaintiff claimed he never received a response to his letter from anyone

in Nassau County, the evidence is to the contrary. It is clear that he met with Commissioner Wells on October 7, 1971 to discuss playing dates and a lease at the Coliseum. PX 4. During that meeting, Wells informed him that no commitment had been made with respect to hockey at the Coliseum and plaintiff assured Wells he would be receiving information from the WHA concerning its "existence and viability." PX 4. No such financial information was ever received by Nassau County, or, at least, never came to the attention of the County Executive's sports advisor, William Shea. Thereafter, plaintiff had numerous oral communications with Wells, during which plaintiff was referred to Shea for further discussion (Shayne, Tr. 145, 165).

By letter to plaintiff dated October 12, 1971, Shea explicitly set forth the County's position as follows:

" . . . Nassau County executive Ralph Caso and myself in particular, have been working hard for months in an endeavor to obtain a hockey franchise from the National Hockey League. . . .

"While we have no lease, in writing, with the [NHL] hockey league, nor have we gotten formal approval of the issuance of a new franchise, our personal interest is to obtain the same, and do not want to be involved in any other commitment of any nature with any other league or team until this matter is resolved. I met with the representatives of the World Hockey Association and told them of our particular interest in the National Hockey League and also of our inability to ascertain any financial data from your new association. I also told them there was no sense in our meeting again nor did county executive Caso desire to meet with anyone, until we ascertain the status of our national league application and also the financial stability of the World Hockey Association. All the information, I have received so far has led me to believe that there is no sufficient finan-

cial stability in the World Hockey Association at this time to warrant our giving any real consideration to the league.

"I also advised your World Hockey representative that in the event I did not receive a National League Hockey franchise within a reasonable time we certainly would be interested in discussing it further with them provided, of course, that the league was financially solvent and of sufficient stability to warrant entering into a lease of our stadium." PX 8.

Despite the unmistakable tenor of Shea's letter, plaintiff replied on October 21, 1971 (PX 9), offering "satisfactory guarantees in the amount of $15,000.00 for 39 playing dates and . . . whatever reasonable guarantees the county may require." However, he furnished no information concerning the financial stability of the WHA or his own ability to field a hockey team of the professional standing sought by the County.

Nonetheless, in early November 1971, Nassau County offered plaintiff 20 dates for the 1972–1973 hockey season in the Coliseum, which he rejected.[2] Instead, plaintiff instituted an unsuccessful Article 78 proceeding to compel the County to negotiate a lease with him. In dismissing that action on the merits, the State Supreme Court held that the County was under no legal duty to lease the Coliseum to "the highest responsible bidder" after "public advertisement." That Court also accepted as made in good faith the County's representation that it would negotiate with plaintiff "as soon as he obtained a franchise from the WHA, on the premise that both leagues would be able to co-exist in the same area." See *In Re Shayne v. The County of Nassau, et al.*, N.Y.L.J., January 17, 1972, at p. 20 (not officially reported).

### Plaintiff's Sale of His WHA Option

Prior to commencing this action, plaintiff applied to the WHA for an extension of his

---

**2.** Plaintiff was also offered all available dates for his proposed WHA team to play in Madison Square Garden in New York City. After a meeting at Madison Square Garden on Novem- ber 13, 1971, to discuss that offer, plaintiff neither pursued nor rejected it, even though the combined Coliseum-Garden dates might well have satisfied plaintiff's option requirements.

option past its expiration date of January 1, 1972. By WHA letter of December 9, 1971 his request was denied, subject to reconsideration if his current status changed. Late in December 1971, plaintiff received an offer from Richard Wood, a New Jersey lawyer, who was interested in organizing a WHA hockey team to play either in New Jersey or Madison Square Garden. Plaintiff accepted and a transaction was arranged pursuant to which Wood paid $50,000 for plaintiff's option, $20,000 going directly to the WHA as the balance due from plaintiff on the original option price. The remaining $30,000 was paid to plaintiff, who also retained the option rights to Long Island.[3]

*Plaintiff's Claims of Antitrust Violation*

Essentially, plaintiff contends the evidence demonstrates that the NHL had no interest in granting a franchise for the Long Island area until he appeared on the scene with his WHA option and attempted to obtain playing dates or a lease at the Coliseum. He asserts that after Buffalo and Vancouver were granted franchises in 1969, the policy of the NHL was not to consider further expansion before 1974 or 1975. In plaintiff's view there is only one explanation for what he terms the NHL's "acceleration of expansion" to Long Island in 1971: to prevent the WHA and plaintiff from gaining access to the "extraordinary market place for hockey" the area offered with the advent of the new Coliseum.

In support of his claims of monopolistic intent on the part of the NHL, plaintiff points to a statement of Campbell, its former president, in a 1965 press release announcing a major expansion of the league from six to twelve clubs, in which it is stated

"that the league was dedicated in its expansion to three principal objectives.

"First, it is intended that the NHL will become the *only major professional league operating coast-to-coast in the United States and Canada.*" PX 34; emphasis by plaintiff.

And as evidence of the league's determination not to expand again before 1974–1975, plaintiff relies on a letter of William Wirtz, then chairman of the NHL Board of Governors, reminding Campbell on August 4, 1971, "that any expansion prior to 1974 to 1975 would require a unanimous vote . . . ." PX 43.

Neither document can fairly be considered even inferentially as proof of intent to foreclose threatened competition in professional hockey. As defendants point out, in 1965 when Campbell's press release was issued, there were no professional leagues in any sport (including baseball, basketball and football) operating coast-to-coast in both the United States and Canada. The NHL itself did not extend to the west coast of Canada until Vancouver was franchised in 1969, after considerable pressure from the City of Vancouver and other Canadian governmental authorities. Even construing the Campbell statement as applicable only to hockey, it is readily susceptible of an intent to expand the NHL from its then regional status to a national league as it is to the monopolistic intent plaintiff would ascribe. Obviously, the WHA was not intimidated from competing with the established league when it later announced its worldwide scope and issued franchises for cities in which NHL franchises were already operating. Nor, apparently, was Richard Wood, who, after acquiring plaintiff's option rights, organized the WHA Raiders hockey team, which played its home games in Madison Square Garden.

The Wirtz letter on its face is also of no aid to plaintiff since it clearly implies that expansion prior to 1974–1975 could only occur by a unanimous vote of the NHL Board

---

**3.** Plaintiff apparently then directed his efforts toward joining the NHL by seeking to participate in a group bidding for the Long Island franchise, since the Board of Governors had not awarded it to Roy Boe, who had previously been the only applicant. The bidding groups were told that the franchise fee was $6,000,000 plus $4,000,000 special indemnity to the New York Rangers. Eventually, Nassau Sports Limited Partnership, of which a Boe corporation, R.L.M. Sports, Inc., was a member, was the only applicant to accept those terms.

of Governors, not that there was to be no further expansion. In fact, as is evident from the minutes of the Board of Governors meeting on June 8, 1971, a proposal to consider further expansion of the league had been on the agenda but was deferred. PX 41. Such a vote was obtained in the case of the Long Island and Atlanta franchises in November 1971. Moreover, plaintiff overlooks the facts that Nassau County's interest in an NHL hockey team for the Coliseum began in 1968; and that in March 1971 —six months before the WHA's formation was announced—Jennings had already visited the new arena under construction in Atlanta, Georgia, and discussed with its owner the prospect of a franchise for the 1972 season.

Similarly, no inference of monopolistic intent can be drawn from the facts that in August 1971 NHL members took note of rumors that another professional hockey league was being formed and that Campbell, acting on Wirtz's recommendation (PX 43), appointed a presidential study committee which discussed "[t]he implications of the proposed formation of the World Hockey Association" and "[a]ll aspects of future expansion of the NHL." PX 45. Obviously, the news was of interest to the NHL and its members. Jennings, who was a member, attended the first and only meeting of the study committee, which was held on September 15, 1971, the day after The New York Times carried the sports article characterizing the WHA as a "threat" to the NHL. There is no reason to doubt his testimony that the committee devoted most of the meeting to discussion of the Times article, since so little information was known about the new league.

Lastly, plaintiff urges the conspiratorial coloration of Shea's "confidential" letter of October 29, 1971 to Campbell, which read:

"Dear Clarence:

"Pursuant to our conversation, this is part of the problem facing us.

"I think you realize the pressure being put upon us, so I am hopeful that everything will be resolved at your meeting on November 8th." PX 11.

Shea's reference to "part of the problem" concededly refers to an enclosed copy of plaintiff's letter of October 20, 1971 offering guarantees for 39 playing dates in the Coliseum for his proposed WHA team. PX 9. The "meeting on November 8th" referred to the special meeting of the Board of Governors at which the deferred question of further expansion of the NHL was to be considered, resulting in the granting of franchises to Long Island and Atlanta. PX 48. Shea candidly acknowledged at trial that his purpose in forwarding plaintiff's letter to Campbell was to get prompt action on Long Island (Tr. 1051–52), a purpose already fully disclosed in Shea's October 12 letter to plaintiff. PX 8, *supra*, p. 11.

In sum, the undisputed facts developed at trial do not support plaintiff's sweeping claims of an NHL intent to destroy his threatened competition through the league's monopolization or attempted monopolization of the business of professional hockey, or that defendants conspired against plaintiff in restraint of trade. Upon all the evidence, the court finds that the negotiations for a Long Island franchise from the NHL were begun and pursued by the Nassau County authorities long before plaintiff or the WHA appeared on the scene; that the legitimate concern of the County authorities in seeking an NHL franchise was to protect a substantial public investment of some $23,000,000 expended for the construction of the Coliseum; that those authorities acted responsibly and in good faith in utilizing the services of William Shea for negotiations with the NHL; that Shea acted in good faith in endeavoring to secure the NHL franchise the County authorities desired; that the NHL acted in good faith in granting the franchise upon the inducement and pressure exerted by the County authorities; that the recipient of the NHL franchise, defendant Nassau Sports Limited Partnership (Roy Boe group), was the only bidder willing to accept the financial terms demanded by the NHL and Madison Square Garden Center, Inc., as owner of the New York Rangers hockey team, whose territorial rights on

Long Island were infringed; that plaintiff at all material times did not have a franchise from the WHA but only an option which expired on January 1, 1972, and did not demonstrate the requisite experience or financial capability to warrant serious consideration as a long-term lessee for a professional hockey program in the Coliseum; and that plaintiff in fact sold his option rights at a profit and rejected offers of playing dates at the Coliseum and Madison Square Garden which could have fulfilled the condition upon which his option was granted.

### The Applicable Law

■ The purpose of the civil remedies provided by the antitrust laws, 15 U.S.C. §§ 15, 26, is to compensate those actually injured by antitrust violations and to prevent by injunctive relief, where necessary, business conduct which in fact may have anticompetitive effects, regardless of the absence of an intent to inflict competitive harm. Thus, the court's finding here that the NHL defendants acted with good intentions in granting a franchise for Long Island at the insistence of the Nassau County authorities would not save an otherwise unlawful restraint upon competition. See *Chicago Board of Trade v. United States,* 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); *American Football League v. National Football League,* 205 F.Supp. 60 (D.Md.1962), aff'd, 323 F.2d 124 (4th Cir. 1963). On the facts of this case, however, the only issues of law which require consideration are (1) whether the NHL possessed monopoly power in a relevant market, and (2) whether its grant of a franchise for Long Island, despite good intentions, had the effect of unreasonably restraining or preventing the anticipated competition of plaintiff in the exhibition of professional hockey games as a prospective franchisee of the WHA.

The Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *United States v. E. I. DuPont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1004, 100 L.Ed. 1264 (1956). Plaintiff contends that the monopoly power of the NHL to exclude competition was conclusively demonstrated in an action instituted in August 1972 in the Eastern District of Pennsylvania captioned "*Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., et al.,* Civ. A Nos. 72–1661" (hereinafter "Philadelphia case"). The plaintiffs in that case were the WHA and twelve of its clubs and franchise holders. The defendants were the NHL and its sixteen member clubs, including those in Atlanta and Long Island.

Examination of the opinion of then District (now Circuit) Judge A. Leon Higginbotham in the Philadelphia case, reported in 351 F.Supp. at 462 (E.D.Pa.1972), reveals that the court made extensive findings of fact and conclusions of law before trial solely for purposes of granting the plaintiffs' motions for a preliminary injunction. That injunction barred the NHL clubs from enforcing the so-called "reserve" clauses in their player contracts in order to prevent their players from contracting to play with WHA clubs. No final judgment was ever entered in the Philadelphia litigation and therefore the findings have no collateral estoppel effect in this action. More importantly, the asserted monopoly power of the NHL in that case was limited to its control over players who were sufficiently talented to play major league professional hockey. As Judge Higginbotham noted, "the WHA does not claim that the NHL has monopoly power to prevent the awarding of WHA franchises in a particular territory or restrict the availability of television contracts." 351 F.Supp. at 510.

■ Monopoly power alone does not constitute a violation of § 2 of the Sherman Act. There must also be evidence of anticompetitive conduct in a relevant market. *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263 (2d Cir. 1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). In the *DuPont* case, *supra,* the Supreme Court described "relevant market" in the following terms:

"In considering what is the relevant market for determining the control of

price and competition, no more definite rule can be directed than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce' monopolization of which may be illegal." 351 U.S. at 395.

Here, there is some disagreement between the parties as to just what is the relevant market. Plaintiff, taking his cue from the Philadelphia litigation, insists that the relevant market is major league professional hockey as played on a nationwide scale in the United States and Canada. Defendant, on the other hand, contends that in this case it is limited to the arenas in the New York franchise area which are reasonably suitable for professional hockey. This would include not only the Nassau County Coliseum but also Madison Square Garden, the Hartford Arena, the Long Island Arena, the Island Garden Arena and the Singer Bowl.

In a sense both parties may be right because modern professional sports usually involve several areas of competition, as is pointed out in *American Football League v. National Football League, supra*, a not dissimilar case. There, in a private antitrust suit, the plaintiff ("AFL") charged the defendant ("NFL") with monopolization, attempted monopolization and conspiracy to monopolize major league professional football. AFL was a newly formed league of eight teams. NFL had been organized in 1920 and in 1960, when the suit was filed, had twelve well-established teams in major cities from coast to coast. The gravamen of the AFL's complaint was the claim that the NFL had moved in and granted a franchise to a group in Minneapolis-St. Paul, where a new municipal stadium was being built, although aware that members of the group were already committed to the AFL and had posted substantial deposits for an AFL franchise. It was also charged that the NFL had hurriedly created the Dallas (Cowboys) franchise to prevent Lamar Hunt, the founder of the AFL, from establishing a team in that city.

In dealing with the relevant market question, the trial court, while recognizing that the competition for attendance and telecast rights is generally confined to the area in which a game is being played, noted that:

"The competition between the leagues for metropolitan areas in which franchises can profitably be located is the most important aspect of the competition in this case. This area of competition is essentially nationwide, embracing all cities and metropolitan areas which may reasonably be expected to support a major league professional football team." 205 F.2d at 65.

In this case, however the relevant market is viewed, the critical element which is absent is unreasonable conduct on the part of defendants. The NHL did not freeze plaintiff out of the Coliseum as he claims, or prevent his competition for public patronage and revenue as an expectant WHA franchisee. As was the case in *American Football League, supra*, where the Minneapolis stadium representatives sought an NFL team before considering the newly formed AFL, the Nassau County authorities in charge of the Coliseum dictated the terms upon which that arena would be available for professional hockey. A State court upheld their legal right to do so and plaintiff may not relitigate that adjudication here. *In re Shayne v. The County of Nassau, supra*.

A wrongful exercise of monopoly power cannot be inferred from mere acceptance of a business opportunity thrust upon the NHL. The preeminence of the NHL in professional hockey made it the logical choice of the Nassau County officials who were responsible for attracting a hockey team that would appeal to sophisticated suburban sports fans and generate the patronage and revenue needed to insure the financial viability of the Coliseum. Indeed, any other choice at that time might have bordered on the irresponsible.

The appointment of William Shea to represent the County was equally responsible action. That he succeeded in persuading NHL officials of the merits of expansion to

the Long Island suburbs can hardly be viewed as anticompetitive conduct which offends the antitrust laws. The subsequent appearance of the WHA and plaintiff certainly did not require the NHL to forego the opportunity offered to it simply to enable the latecomer to compete more effectively.

As the court noted in *American Football League v. National Football League, supra,* 323 F.2d at 131:

"It frequently happens that a first competitor in the field will acquire sites which a latecomer may think more desirable than the remaining sites, but the firstcomer is not required to surrender any, or all, of its desirable sites to the latecomer simply to enable the latecomer to compete more effectively with it."

Here, as previously noted, plaintiff was not in fact denied all access to the Coliseum, fn. 2, *supra,* p. 12, nor relegated to unsuitable arenas, since he was also offered playing dates in Madison Square Garden, which his successor, Richard Wood, utilized for the WHA hockey team he organized.

Relying heavily on *United States v. Aluminum Co. of America* ("Alcoa"), 148 F.2d 416 (2d Cir. 1945), plaintiff has sought to draw a parallel between a professional sports league and the internal expansionist policies of a huge industrial complex, as was done in the Philadelphia case. Judge Higginbotham in that case wholly embraced the rationale of *Alcoa* in concluding that the NHL's continuing policy of expansion, tied to increasing public interest in hockey, was evidence of its intent to maintain control over professional hockey; and that its control over the supply of players was maintained through improper means, namely, the reserve clause and interlocking agreements with minor professional leagues which developed the players. 351 F.Supp. at 512–13. Plaintiff would have the analogy extended to control over suitable arenas for professional hockey.

First, it is not at all clear that the *Alcoa* rationale is appropriate to the rather unique business of professional team sports,[4] in which the measure of success is an increase in the number of teams in a league and consequent expansion to additional playing locations. One element of that success is the process of developing interest in the sport sufficient to justify expansion. See *American Football League, supra,* 323 F.2d at 130–31. As Judge Hand noted in *Alcoa,* "[t]he successful competitor, having been urged to compete, must not be turned upon when he wins." 148 F.2d at 430.

Second, it is clear in this case that the NHL was not in fact competing for an arena with the WHA or plaintiff. Rather, the competition was between plaintiff, on the one hand, and the two or more groups who were endeavoring to bring professional hockey to the Coliseum under the NHL banner with the ardent backing of the Nassau County authorities who controlled it. The $10,000,000 price tag on an NHL franchise could hardly be considered an anticompetitive inducement designed to restrain the WHA or plaintiff from organizing a hockey club within the broad limits described in plaintiff's option. There is no evidence that the NHL would have granted a franchise had those terms not been met by the successful bidder. There is evidence that other arenas suitable for hockey existed within those limits. The evidence also demonstrates that plaintiff's option-purchaser, Richard Wood, succeeded in establishing a WHA hockey club in Madison

---

4. A number of courts have recognized that members of professional team sports leagues are more like economic joint venturers than competitors, see, *e. g., Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178–79 (D.C.Cir.1978); *North American Soccer League v. National Football League,* 465 F.Supp. 665, 673–74 (S.D. N.Y.1979) (collecting cases), and enjoy peculiar relationships among themselves and the league. Apposite here is the comment of the district court in *American Football League, supra,* that "[m]any of the owners are colorful persons, notably individualistic, who often act for highly personal reasons. Their views on most subjects are apt to differ widely.... [S]ome of the owners felt that it would be unwise to dilute their interest ... by adding clubs of unproved strength. One or two had personal reasons for opposing expansion, such as hoping to sell or transfer a franchise." 205 F.Supp. at 66.

Square Garden despite the granting of the NHL franchise for Long Island. That plaintiff failed to do so cannot be attributed to asserted antitrust violations which the evidence wholly fails to support.

The court concludes that the defendants have not monopolized or attempted to monopolize major league professional hockey or engaged in any conspiracy to injure plaintiff and that plaintiff is entitled to no relief herein.

Judgment dismissing the action on the merits will be entered in favor of defendants, with costs.

SO ORDERED.